**Vicki JORDAN, Plaintiff,**

v.

**NORTHROP GRUMMAN CORP. WELFARE BENEFIT PLAN, et al. Defendant.**

**No. CV98–3726ABC(JGX).**

United States District Court, C.D. California.

June 15, 1999.

Thomas Falvey, Pasadena, CA, for Plaintiff.

Polly Dennis, Sheppard, Mullin, Richter & Hampton, Los Angeles, CA, for Defendant Northrup Grumman.

Thomas Kaufman, Diana Tabacopoulos, Seyfarth, Shaw, Fairweather, Los Angeles, CA, for Defendants Northrup Grumman, Welfare Benefit Plan, and Metropolitan Life Insurance Co.

## ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT

COLLINS, District Judge.

Defendants' motion for summary judgment and Plaintiff's motion for summary judgment came on regularly for hearing before this Court on June 14, 1999, and was taken under submission following oral argument. After reviewing the materials submitted by the parties, argument of counsel, and the case file, it is hereby ORDERED that Defendants' motion is GRANTED and Plaintiff's motion is DENIED.

### I. Factual Background

Plaintiff VICKI JORDAN ("Plaintiff") filed this action under the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B) ("ERISA") against Defendants Metropolitan Life Insurance Compa-

ny ("MetLife") and Northrop Grumman Corporation Welfare Benefit Plan (collectively "Defendants") for wrongful denial of long-term disability benefits. The parties cross-moved for summary judgment as to Plaintiff's claim for disability benefits.

The Court reviews this case based on the following undisputed facts:

## A. Plaintiff's Background

Plaintiff worked as a Senior Administrative Secretary for Northrop Grumman from August 20, 1984 until May 17, 1995. Pl.'s Statement of Uncontroverted Facts ("Pl.'s Fact") 1. Plaintiff's job required her to perform administrative and secretarial work keeping administrative records, transact routine business, explain superiors' policies to others, relay assignments, check documents, and prepare and type reports and correspondence, among other administrative work. Pl.'s Exh. 2 (Job Description). At the time she stopped working, Plaintiff was earning $3250.00 per month. Pl.'s Exh. 3. Plaintiff's compensation included membership in Northrop's long-term disability insurance plan ("the Plan"). Stanton Decl., Exh. A (Summary Plan Description) at 5.

Plaintiff ceased working for Northrop on May 17, 1995, when she was diagnosed with fibromyalgia. Pl.'s Fact 1. On September 11, 1995, Plaintiff applied for the first time for long-term disability benefits under Northrop's long-term disability insurance plan. Pl.'s Exh. 9.

## B. Relevant Plan Provisions

MetLife served as the claims administrator of the Plan at all times relevant to this action.[1] Stanton Depo. at 25:19–26:1; Stanton Decl., Exh. A. The parties concur that the Plan confers discretion upon the claims administrator to interpret the terms of the Plan:

1. Travelers Insurance Company ("Travelers") handled the claim originally, but later, MetLife became Travelers successor in interest with respect to the administration of Travelers' disability business and Plaintiff's LTD

The Travelers will serve as the final review committee under the Plan to determine for all parties all questions relating to the payment of claims for benefits under the Plan and shall notify you in writing about the decision on your review. *The Travelers has the discretion to construe and interpret the terms of the Plan and the authority and responsibility to make factual determinations.*

Stanton Decl., Exh. A (Summary Plan Description) at 5.

Plan participants must meet certain specifications in order to be deemed eligible for long-term disability benefits ("LTD benefits"). Participants must be totally disabled for six months before the claimant is eligible to receive LTD benefits. *Id.* at 13. The Plan defines a "total disability" as a condition which requires that, after exhausting the six-month elimination period, the claimant must still be "unable to perform all the normal duties of [her] regular occupation for any employer and [she] must at no time engage in any occupation or employment for pay or profit." *Id.* at 26. After eighteen months, the employee must be "completely unable to engage in any occupation or employment for which [she] [is] or become [s] qualified." *Id.*

## C. Plaintiff's Medical Condition

From the beginning of May 1995, Plaintiff has sought medical attention for a variety of ailments, including back, leg, and knee pain, bilateral hand achiness, parvovirus, polyarthritis, depression, and fibromyalgia. *See* Pl.'s Exhs. 7, 8, 9, 16, 31, 39, 40. However, Plaintiff bases her disability claim solely on her fibromyalgia diagnosis. *See, e.g.,* Exh. 22 (Pl.'s Appeal letter of April 11, 1996).

benefits claim. In the interests of clarity, the Court will refer to all decisions made regarding Plaintiff's claim as if they were made by MetLife.

During April or May of 1995, Plaintiff began consulting with an internist, Dr. Nerendrana Reddy, who ordered various medical tests to be taken to determine the source of Plaintiff's leg and back pain. In particular, Dr. Reddy ordered an MRI report dated May 17, 1995 from Dr. Tien T. Peng, which reflected mild facet disease but no significant central or foraminal stenosis or abnormal alignment. Stanton Decl., Exh. B (Administrative Record ("AR")) at D6. Dr. Reddy also ordered a laboratory report from MERIS Laboratories, dated May 17, 1995, which revealed a negative result for systemic sclerosis and various other conditions. *Id.* at D12–18. An electromyogram ("EMG") report was also performed on May 26, 1995 by a neurologist, Dr. Charles Imbus, and reflected a normal result. *Id.* at D19–20. Based on these tests and his own evaluation, Reddy determined that Plaintiff suffered from fibromyalgia. *See* Pl.'s Exh. 6 (Reddy's medical notes).[2] Dr. Reddy's examination notes, although difficult to read, appear to include the word "disability" or that Plaintiff's disability should be extended. *See* Pl.'s Exh. 16.

In June 1995, Dr. Reddy referred Plaintiff to a neurologist, Dr. Mihoko Nelson ("Nelson") for evaluation of Plaintiff's leg pain. Dr. Nelson found Plaintiff reported "some tenderness" in the paraspinal and trapezius muscles, and "rather diffuse pain of the low back, neck, shoulder and legs," which Nelson determined amounted to a diagnosis of fibromyalgia. Pl.'s Exh. 7 at D21–22. At the same time, Nelson observed that Plaintiff was a "well developed, well nourished woman in no acute distress," who was "freely ambulatory." *Id.*

at 21. Moreover, Plaintiff's neurological examination was normal. *Id.* at 21. Dr. Nelson prescribed a Medrol Dose Pack during this visit, and noted on June 13, 1995, that the Medrol Dose Pack helped Plaintiff. *Id.* at 22. Dr. Nelson suggested that Plaintiff see a rheumatologist, but did not indicate that Plaintiff was disabled at this time. *Id.*

Plaintiff followed Dr. Nelson's advice and on July 21, 1995, rheumatologist Dr. Brian O'Connor reported the results of his consultation with Plaintiff to Dr. Reddy. *See* Pl.'s Exh. 8. Dr. O'Connor's report noted that Plaintiff tested negative for a variety of muscular and skeletal conditions. *Id.* at D27. Plaintiff's neurological exam revealed no abnormalities and showed Plaintiff had normal light touch in the upper and lower extremities without any proximal muscle weakness. *Id.* Although Plaintiff reported achiness to the knees, the x-rays showed no significant arthritis. Similar to Dr. Nelson, Dr. O'Connor diagnosed Plaintiff as having a generalized fibromyalgia based on Plaintiff's pain in ten out of "the classic" 19 trigger spots which indicate fibromyalgia. *Id.* Also similar to Dr. Nelson, Dr. O'Connor did not assert that Plaintiff was disabled. *Id.* In subsequent visits to Dr. O'Connor prior to the initial denial of Plaintiff's claim, Dr. O'Connor generally maintained this diagnosis. Dr. O'Connor further noted that Plaintiff had good responses to medication. *See* Pl.'s Exh. 8 at D32 (report of September 1, 1995) and D45 (report of November 13, 1995). Although Plaintiff appeared to experience "mild depression," in September, according to Dr. O'Connor, the depression appeared to

---

**2.** Plaintiff argues that Dr. Reddy had, in fact, repeatedly stated that Plaintiff was disabled in his notes excusing her from work for medical reasons. *See* Pl's. Exh. 16. However, these notes were not part of the administrative record reviewed by MetLife in reaching its decision. For the reasons stated below, the Court subjects MetLife's review to an abuse of discretion standard. Therefore, under Ninth Circuit law, the Court may not consider any documents external to the record. *See Taft v.*

*Equitable Life Assurance Society,* 9 F.3d 1469, 1471 (9th Cir.1993). Moreover, it is not the duty of the administrator to seek out evidence which is not before them. *Sandoval v. Aetna Life and Casualty Ins.,* 967 F.2d 377, 381 (10th Cir.1992) ("If a plan participant fails to bring evidence to the attention of the administrator, the participant cannot complain of the administrator's failure to consider this evidence."); *see also LeFebre v. Westinghouse Elec. Corp.,* 747 F.2d 197, 208 (4th Cir.1984).

wane in November. *See* Pl.'s Exh. 8 at D32 (report of September 1, 1995) and D45 (report of November 13, 1995). In addition, Dr. O'Connor noted that Plaintiff had "done relatively well" on the medications he prescribed for Plaintiff's post-parvovirus arthritis and fibromyalgia. *See* Pl.'s Exh. 8 at D45.

## D. Application, Review, and Denial of Plaintiff's Claim for Benefits

On September 11, 1995, Northrop submitted a claim for LTD benefits on Plaintiff's behalf. Pl.'s Exh. 9. In response, MetLife requested Plaintiff to submit certain information within thirty days to Met-Life, including an attending physician's statement, so that her claim could be processed. *Id.* MetLife also suggested that if Plaintiff had any questions regarding the letter, she should call MetLife. *Id.* Nearly two months later, on November 2, 1995, MetLife indicated that Plaintiff had not sent in any of the materials and, consequently, MetLife granted Plaintiff an additional thirty days to submit the requested documents. AR at D41.

### 1. Initial Review and Denial of Plaintiff's Claim

On November 7, 1995, Plaintiff submitted certain documents to MetLife, including a personal profile evaluation. In her evaluation, Plaintiff reported aches in her legs, knees, feet, toes, and hands. Pl.'s Exh. 11 at D42. Although Plaintiff noted that she had great difficulty doing household tasks, she noted that she could perform such tasks as mopping, cooking, laundry and grocery shopping every other week or sometimes monthly, depending upon the pain she was experiencing. *Id.* Plaintiff also noted that to do laundry, she had to climb three flights of stairs. *Id.* Plaintiff had no help in performing these household chores. *Id.* Finally, Plaintiff noted that although she hoped to return to work soon, "the diagnosis varies" as to whether she will be able to do so. *Id.* In addition to the personal profile evaluation, Plaintiff submitted an authorization for MetLife to obtain her medical records. Pl.'s Exh. 12 at D44.

After receiving this information, in letters dated December 1, 1995, MetLife informed Plaintiff's treating physicians (Drs. O'Connor, Reddy, and Nelson) that Plaintiff had "applied for or is receiving disability benefits" and requested the doctors to provide a narrative report outlining all of the following: diagnosis, dates of treatment, subjective complaints, objective findings, current treatment regime, ability to perform activities of daily living, rehabilitation potential, and prognosis regarding eventual return to work. Pl.'s Exhs. 13–14. None of Plaintiff's doctors responded to the request. Consequently, MetLife reiterated its request by letters dated January 2, 1996. Pl.'s Exh. 18.

Despite receiving two notices, Plaintiff's physicians failed to submit the requested disability reports. MetLife, therefore, denied plaintiff's claim by letter dated January 23, 1996. Pl.'s Exh. 20. The letter stated that MetLife had reviewed Plaintiff's medical records from Drs. Reddy, Nelson and O'Connor, as well as Plaintiff's submissions and determined that Plaintiffs' activities were limited to some degree by fibromyalgia, but that Plaintiff's condition was not of such severity as to preclude Plaintiff's ability to work at her "sedentary occupation" as Senior Administrative Secretary. *Id.* Furthermore, the letter informed Plaintiff about the procedure for appealing the decision and invited Plaintiff to call her case manager at an 800–number if she had questions.

### 2. First Appeal and Subsequent Denial of Plaintiff's Claim

On April 11, 1996, Plaintiff requested an appeal of her claim denial. Pl.'s Exh. 22. Plaintiff identified her condition as fibromyalgia and stated that she would submit further documentation that would describe her condition as worsening. *Id.* Plaintiff also requested that MetLife contact Drs. Reddy, O'Connor, and Nelson to obtain

further information regarding Plaintiff's condition. *Id.* In response, MetLife specifically requested Plaintiff to submit additional medical information which "supports a condition of total disability. The additional medical documentation should include all objective findings (lab & x-ray results, physical exam findings, etc), and your restrictions and limitations." Pl.'s Exh. 24.

On appeal, Plaintiff presented further medical reports from Plaintiff's treating physicians. Dr. O'Connor indicated an increase in Plaintiff's fibromyalgia trigger points from ten to fifteen out of nineteen points as well as sleep disorders. *See* Pl.'s Exh. 23 (O'Connor report of April 15, 1996). An EMG study showed an "essentially normal" result. A.R. at D80. Otherwise, the medical tests and diagnoses did not vary significantly from those conducted prior to Plaintiff's first review.

In conducting its review of Plaintiff's case, MetLife not only considered the information presented to it by Plaintiff, but also engaged in several efforts to compile further information of Plaintiff's condition. First, MetLife submitted Plaintiff's medical records for an independent review by J.W. Rodgers, an internist. Dr. Rodgers opined on July 3, 1996 in a terse and largely conclusory report, that the file provided "little evidence" that Plaintiff could not perform the tasks associated with her job description. A.R. at D86.

Second, MetLife received a letter from Dr. Reddy in response to its request for "objective findings" that prevented Plaintiff from performing sedentary work. Dr. Reddy's response was even more conclusory than that of Dr. Rodgers, declaring Plaintiff "disabled due to Fibromyalgia," and attaching his progress notes and Dr. O'Connor's reports.

Third, MetLife submitted all records (including Dr. Reddy's letter) to Dr. Rodgers for a reevaluation of his opinion in light of Reddy's additional report. MetLife also forwarded the file to an independent specialist in rheumatology, Dr. Jefrey Lieber-

man, for an appraisal of Plaintiff's reported symptoms on her ability to perform her duties as an administrative secretary. A.R. at 101–102. Dr. Rodgers responded that the additional information did not dissuade him from his original opinion. *Id.* at 103.

Although reaching the same conclusion, Dr. Lieberman, submitted a detailed evaluation of Plaintiff's file. *See generally* Pl.'s Exh. 34. In particular, Dr. Lieberman opined that Plaintiff lacked sufficient evidence that her fibromyalgia amounted to a disability preventing Plaintiff from performing her job tasks. *Id.* at D104. Dr. Lieberman also criticized Dr. O'Connor's methodology and diagnosis. *Id.* (noting O'Connor referred to 19 classic tender spots instead of the 18 recognized by the American College of Rheumatology, improperly prescribed Medrol dose packs which are not the indicated treatment, and diagnosed post parvovirus arthritis with no laboratory support for this diagnosis). Furthermore, Dr. Lieberman stated that none of Plaintiff's doctors prescribed the routine treatment to alleviate fibromyalgia. *Id.* ("There is no mention of an exercise program for this patient nor particularly any specific education regarding fibromyalgia. Education and exercise are essential in the proper treatment for fibromyalgia."). Finally, Dr. Lieberman noted that if Plaintiff began an exercise regiment and took certain precautions at work, he did not believe she would be restricted in any way from performing her duties. *Id.*

Based on the additional expert opinions, as well as the entire claim file, MetLife denied Plaintiff's claim for LTD benefits a second time on October 3, 1996. Pl.'s Exh. 36. The letter explained that MetLife had reviewed Plaintiff's file as well as submitted Plaintiff's file for review by Drs. Rodgers and Lieberman. *Id.* Although MetLife found that record reflected diagnoses of fibromyalgia and depression, MetLife concluded that there was insufficient documentation of treatment supporting a LTD

due to a nervous or mental condition. *Id.* As for the fibromyalgia diagnosis, on the other hand, MetLife determined that the record presented evidence of fibromyalgia, but found that many of Plaintiff's symptoms were based on her subjective experiences which could not be easily quantified. *Id.* Moreover, MetLife relied on the determinations of Drs. Rodgers and Lieberman who concurred that Plaintiff could perform the sedentary work called for by her job description to conclude that Plaintiff was not disabled under the Plan's terms. *Id.*

In spite of this apparently final ruling, four days later, on October 7, 1996, MetLife sent a copy of Dr. Lieberman's report to Dr. O'Connor for review of the treatment recommendations. Pl.'s Exh. 37. At Dr. Lieberman's request, his letter was not forwarded to Plaintiff. Although Dr. O'Connor did not specifically comment on Dr. Lieberman's findings or recommendations, on October 10, 1996, Dr. O'Connor sent MetLife a 3–sentence letter indicating that he was treating Plaintiff for polyarthritis and a general fibromyalgia syndrome. Pl.'s Exh. 39. Dr. O'Connor concluded in this letter that "[u]nder her current state of affairs [Plaintiff] is medically disabled from her job as a secretary." *Id.*

### C. Plaintiff's Second Appeal and Final Denial

On October 24, 1996, Plaintiff submitted a typed letter describing her symptoms at length and requesting a second appeal of the denial of her claim. As part of her appeal, Plaintiff appears to have attached Dr. O'Connor's letter of October 10, 1996, referred to above, and a letter from Dr. Reddy dated October 18, 1996, which was nearly identical to his earlier letter of August 16, 1996. *See* Pl.'s Exhs. 39, 40. In short, both doctors' letters concluded without explanation that Plaintiff was disabled from her job as a secretary due to fibromyalgia.

MetLife denied Plaintiff's second appeal by letter dated November 18, 1996. *See*

Pl.'s Exh. 42. The letter largely repeated MetLife's denial letter of October 3, 1996, but referred to the additional materials filed by Plaintiff for this final review. MetLife explained to Plaintiff that although Plaintiff's symptoms are "subjective in nature and difficult to corroborate," the information in the record did not substantiate Plaintiff's assertion that these symptoms would prevent her from performing her sedentary work. *Id.*

Following the denial of Plaintiff's second appeal, she filed a complaint in this Court. On May 21, 1999, Defendants filed a motion for summary judgment in this case. Plaintiff also filed a motion for summary judgment against Defendants on May 24, 1999. On May 28, 1999, both Plaintiff and Defendants filed oppositions to the motions for summary judgment. Both parties filed their replies on June 7, 1999.

Plaintiff acknowledges that the Plan vests discretionary authority with MetLife. Nonetheless, in her motion for summary judgment, Plaintiff argues that because MetLife had a conflict of interest in reviewing this case, Plaintiff is entitled to a de novo review. Even if the Court only subjects MetLife's decision to a review for abuse of discretion, Plaintiff asserts that its decision must be reversed because MetLife acted arbitrarily or capriciously in denying her claim. Defendants counter that Plaintiff cannot assert an actual conflict of interest and, that, in any event, the denial of Plaintiff's claim results from MetLife's reasonable decision.

### II. Discussion

#### A. Summary Judgment Standard

It is the burden of the party who moves for summary judgment to establish that there is "no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). If the moving party has the burden of proof at trial (the

plaintiff on a claim for relief, or the defendant on an affirmative defense), the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–88 (1984)). This means that, if the moving party has the burden of proof at trial, that party must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in that party's favor. *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986). Furthermore, the court must view the evidence presented to establish these elements "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If the opponent has the burden of proof at trial, then the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead, ... the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish an essential element to that party's case, and on which that party would bear the burden of proof at trial.

*Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id.* at 248, 106 S.Ct. 2505; *Griffeth v. Utah Power & Light Co.,* 226 F.2d 661, 669 (9th Cir.1955).

## B. Analysis

### 1. Standard of Review for ERISA Benefit Determinations

 The standard with which the Court must review the benefits eligibility decision depends upon how much discretion the Plan grants an administrator or fiduciary to determine eligibility for benefits or to construe the terms of the plan. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). When an ERISA plan vests its administrator with such discretion, as the parties agree the Plan does in this case, the district court ordinarily reviews the administrator's decision for abuse of discretion, rather than performing a de novo review of the record. *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Technology, Inc.,* 125 F.3d 794, 797 (9th Cir.1997).

 Yet even when the plan vests the administrator with discretion, the degree of deference associated with this standard of review may be affected if a plaintiff makes a sufficient showing that the administrator has a conflict of interest. *Snow v. Standard Ins. Co.,* 87 F.3d 327, 330 (9th Cir.1996). The court must first inquire whether a formal conflict of interest exists because of an administrator's dual role as both the funding source and the administrator of the plan. Next, the court considers whether this inherent conflict of interest actually influenced the decision. *See Lang,* 125 F.3d at 798; *Atwood v. New-*

*mont Gold Co., Inc.*, 45 F.3d 1317, 1322 (9th Cir.1995). The burden to show an actual conflict of interest lies first with the affected beneficiary who must present "material probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary." *Atwood*, 45 F.3d at 1322. If the beneficiary satisfies this burden, the Court still reviews on an abuse of discretion basis, but it becomes "less deferential." *See Snow*, 87 F.3d at 331 (citing *Atwood*, 45 F.3d at 1322).

### 2. Conflict of Interest

The parties do not dispute that MetLife had a formal conflict of interest because, as the insurance company, it had to pay the benefits it awarded as Plan administrator. The question is whether this formal conflict of interest infected Defendants' evaluation of Plaintiff's claim.

As noted above, Plaintiff bears the initial burden of providing material, probative evidence beyond the apparent conflict that tends to show MetLife's self-interest caused a breach of its fiduciary duties. Plaintiff sets forth the following as establishing MetLife's conflict of interest: 1) MetLife failed to give sufficient weight to evidence supporting Plaintiff's claims; 2) MetLife failed to give Plaintiff sufficient guidance concerning the information needed in order for Plaintiff to qualify for LTD benefits; 3) the time frame in which MetLife requested Plaintiff provide evidence of disability was contrary to the Plan; and 4) MetLife spent an insignificant amount of money investigating Plaintiff's claim in relation to the total value of the claim. For the reasons stated below, the Court finds Plaintiff's assertions meritless.

### a. MetLife Considered All the Evidence Before It

Plaintiff first contends that MetLife "ignored" her subjective reports of pain and her doctor's reports when denying her claims. Pl.'s Motion at 13. Plaintiff presents no evidence of this other than the fact that the denial letters do not specifically discuss Plaintiff's own reports. However, this assumption is belied both by the unrebutted testimony of Plaintiff's claim reviewers and the text of some of the denials themselves. The claim reviewers stated in testimony and in several of the denials that they reviewed the entire file of Plaintiff's case. *See* Woodside Depo. 11:21–12:21 (describing her "absolute method" as reading "from page 1, the very first page, to the very last page.... I go back through it entirely page by page a second time."); Stanton Depo. at 142:24–143:15 (testifying that she took Plaintiff's letter into account when reviewing Plaintiff's claim); *see also* Pl.'s Exh. 20 (Denial of Claim dated January 23, 1996) (noting that Plaintiff's "activities may be limited to some degree" by fibromyalgia symptoms; only Plaintiff, and not Plaintiff's doctors had specifically referred to her condition as limiting certain specific activities); Pl.'s Exh. 36 (Denial of First Appeal dated October 3, 1996) ("*All* documentation has again been carefully reviewed") (emphasis added); Pl.'s Exh. 42 (Denial of Second Appeal dated November 18, 1996) (reporting that all documentation has been reviewed "including your letter of October 24, 1996"). Furthermore, the claims reviewers forwarded Plaintiff's entire file to Drs. Lieberman and Rodgers for their examination. Stanton Depo. at 88:13–89:9.

Plaintiff's argument appears to shift the burden in making a claim. Plaintiff faults MetLife because "*[n]othing* in defendant's records disproves the pain Ms. Jordan explained." But the burden in making such a claim is on Plaintiff, and MetLife determined that she provided insufficient objective evidence that these difficulties in doing strenuous tasks prevented her from performing her largely sedentary job as an administrative secretary. When her doctors finally submitted reports on her behalf, they contained only conclusions that Plaintiff was disabled, but lacked any de-

scription of symptoms observed or diagnostic tests to support their conclusions. Moreover, Plaintiff's own attestations to her conditions somewhat undercut her assertions of total disability. Plaintiff acknowledges, for instance, that although she performs the physically arduous tasks of grocery shopping, mopping, cooking and climbing up-and-down three flights of stairs to do laundry with less frequency because of her illness, she has continued to be able to perform these tasks on her own. Pl.'s Exh. 11 at D42. Simply because MetLife did not rely on Plaintiff's evidence does not mean that it ignored it. As one court put it, "MetLife was entitled to consider all of the evidence before it." *Steinmann v. Long–Term Disability Plan of the May Dept. Stores Co.,* 863 F.Supp. 994, 1000 (E.D.Mo.1994). Having considered all of the evidence before it, it is a proper exercise of discretionary function to favor objective evidence over subjective evidence. *Id.; Voight v. Metropolitan Life Ins. Co.,* 28 F.Supp.2d 569, 579 (C.D.Cal. 1998) (holding denial of claims on grounds that medical records did not provide "objective evidence" of disability was reasonable). Because such conduct is reasonable, it follows that it cannot be used to substantiate a claim that MetLife's inherent conflict of interest caused it to violate its fiduciary duties.

### b. MetLife provided Plaintiff sufficient guidance regarding what information she need to file

██ Plaintiff next contends that MetLife did not provide her sufficient guidance in filing her claim because it did not tell her what information MetLife needed from Plaintiff's doctors. The Court disagrees.

Given that MetLife sent several series of letters to Plaintiff's doctors during her initial application and appeal, Plaintiff cannot,

and, in fact, does not, maintain that her doctors had insufficient notice of what information was required for her claim to be approved.[3] Thus, Plaintiff resorts to drawing a distinction between the adequacy of guidance given to her and the adequacy of information given to her doctors. In the first place, Plaintiff has presented no law supporting this distinction, and the Court does not find it to be a tenable one. It is not unreasonable for MetLife to believe that because Plaintiff's doctors are in at least as good, if not a better, position than Plaintiff to answer its queries regarding Plaintiff's medical condition, that the specific requests are more appropriately sent directly to them.

Yet even if the Court accepts Plaintiff's distinction, MetLife has provided Plaintiff directly adequate guidance in filing her claims. In response to Plaintiff's application, MetLife informed Plaintiff that it needed an "attending physician's statement." Furthermore, on December 14, 1995, MetLife notified Plaintiff that it had contacted Plaintiff's doctors "for information needed to further evaluate" Plaintiff's claim. A.R. at D58. The letter specifically requested that Plaintiff "contact their offices and ask them to respond to our request as soon as possible." MetLife's response to Plaintiff's appeal provided her even more guidance as to what MetLife needed to make a proper evaluation of Plaintiff's claim. *See Davis v. U.S. West, Inc.,* No. 8:CV94–00070, 1996 WL 673148, at *6 (D.Neb. Sept.26, 1996) (considering adequacy of claim procedure as a whole). In a letter dated April 26, 1996, MetLife explicitly told Plaintiff that "the additional medical documentation" to support her claim for total disability "should include all objective findings (lab & x-ray results, physical exam findings, etc), and your restrictions and limitations from 5/17/95." Pl.'s Exh. 24. Moreover, each of MetLife's

---

**3.** *See, e.g.* Pl.'s Exh. 13 (requesting a narrative report from Plaintiff's doctors addressing diagnosis, dates of treatment, subjective complaints, objective findings, current treatment regime, ability to perform activities of daily living, rehabilitation potential and prognosis regarding eventual return to work).

letters to Plaintiff informed her that she should call if she had further questions.[4]

■ It is not inappropriate for an insurance company to place an initial burden of proof on claimants. *See Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 985 (6th Cir.1991). MetLife's correspondence with Plaintiff sufficiently informed her of the medical information which it needed, and repeatedly advised Plaintiff to call her MetLife claim reviewers if she had further questions. At that point, Plaintiff bore some responsibility to either present the information herself, encourage her doctors to do so, or request further information from MetLife. That MetLife did not mail her copies of the precise letters it sent to Plaintiff's doctors cannot be considered inadequate guidance, let alone sufficient to show a conflict of interest. As opposed to the administrators in *Laird v. Metropolitan Life Ins. Co.*, 800 F.Supp. 1506, 1507 (N.D.Ohio 1992), MetLife sent all information to Plaintiff's correct address. Moreover, unlike the incarcerated plaintiff in *Laird,* Plaintiff here "was not prevented by circumstances from providing medical proof." *Id.* Plaintiff certainly had free access to both her doctors and MetLife reviewers. She *could* have provided information, and MetLife repeatedly informed both Plaintiff and her doctors what sorts of information would be considered relevant and helpful. That neither Plaintiff nor her doctors actually *did* present this information cannot now be blamed on MetLife.[5]

### 3. The Time Frame in Which Met-Life Requested Plaintiff Provide Evidence of Disability Does Not Suggest a Conflict of Interest

■ Plaintiff's third argument asserts that MetLife abused its discretion because it did not expend sufficient time considering the claim or permit Plaintiff to submit evidence in support of her claim. In particular, Plaintiff asserts that, while the Plan requires a claimant to be disabled for 180 days before she is eligible to receive LTD benefits, MetLife did not wait until this period expired before initially denying Plaintiff's claim.

Plaintiff correctly notes that a claimant must be disabled for 180 days before the onset of disability payments. Plaintiff also correctly notes that she may file a claim for coverage as late as 90 days after the waiting period ends. However, Plaintiff does not and cannot show that these requirements somehow set limits on the time in which MetLife may review a claim once it is filed. Nothing in the Plan indicates such a limit. In fact, given the lengthy review process (Plaintiff's lasted for eighteen months before her final denial), such a requirement would impose an unnecessary delay on qualifying parties.

Furthermore, Plaintiff has not presented any evidence that the time period hampered her ability to file a claim. First, MetLife never imposed strict time limits

---

4. MetLife's letters to Plaintiff and to her doctors make this case significantly different from the factual scenario presented in *Booton v. Lockheed Medical Benefit Plan,* 110 F.3d 1461 (9th Cir.1997), on which Plaintiff relies. In that case, the plan issued only one or two sentence responses which did not indicate what Plaintiff needed. *Id.* at 1462 n. 5. The administrator's consulting dentist even informed the administrator that specific information would help substantiate the applicant's claim, but the administrator failed to ask for it. *Id.* at 1463. Nor did the administrators ask plaintiff's dentists to explain the reasons for their treatment choices. *Id.* As stated above, MetLife repeatedly tried to get further information regarding Plaintiff's condition from Plaintiff's doctors and specifically

informed her and her doctors what information was needed to help substantiate her claim. Therefore, the ruling in *Booton* cannot be applied to the Defendants here.

5. The Court notes that Plaintiff's doctors' unresponsiveness to the many requests for information made both this Court's review, and, more importantly, MetLife's review difficult. Under an abuse of discretion standard, however, in which the Court must consider whether, based on the evidence before it, the administrator acted arbitrarily and capriciously, the Court cannot hold MetLife responsible for the inaction of doctors who are not under the administrator's control.

on Plaintiff. Although MetLife's first letter to Plaintiff requested that she file certain information within thirty days, upon hearing nothing from Plaintiff, two months later, MetLife extended Plaintiff an additional thirty days to respond to their requests. Second, Plaintiff never requested an extension of time or suggested to Met-Life that limited time prevented her from providing certain information. Third, even if Plaintiff could show that she and the doctors had insufficient time to respond to MetLife's original request, as of Plaintiff's final denial, approximately one and one-half years after her initial request, this claim is no longer viable. The undisputed evidence suggests that MetLife subjected Plaintiff's file to full review after each of her appeals. Despite the nine-month period which ensued after Plaintiff's original denial, Plaintiff's doctors failed to submit any reports which responded to the many requests for information sent to them by MetLife. For these reasons, the Court finds the purported speed of MetLife's denial of Plaintiff's claim does not indicate a decision tainted by conflict of interest.

### 4. Comparing the Cost of MetLife's Review Versus the Lifetime Benefit of Plaintiff's Claim is Irrelevant

■ In her final argument in favor of de novo review, Plaintiff asks the Court to consider the fact that MetLife incurred a cost of "less than ⅒ of 1% of the lifetime value of Plaintiff's claim" in processing Plaintiff's application. The Court finds no legal, logical, or factual support to Plaintiff's contention. There is no indication that the claims that have been successful are the product of more financial investment. Nor is there any indication that MetLife spent less on Plaintiff's claim than it usually does.

Moreover, Plaintiff's argument yields an unacceptable conclusion from a public policy standpoint: that the more valuable the claim, the more time MetLife should expend examining it. The relevant inquiry is whether MetLife expended sufficient effort in examining Plaintiff's claim because of its complexity, not because of its value. Met-Life spent significant time on plaintiff's claim, dispatched repeated requests for information to Plaintiff's doctors and to Plaintiff herself, consulted with an internist and a specialist in rheumatology to elicit their opinions regarding Plaintiff's case, and reviewed Plaintiff's file fully on three different occasions. The only step that MetLife did not take that Plaintiff suggests it should have was to have Plaintiff submit to an independent medical examination, which ERISA does not require. *See, e.g. Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 602 (5th Cir.1994) (upholding denial of claim based only on physician review of plaintiff's file); *Voight*, 28 F.Supp.2d at 580 (same); *cf. Saelee v. Chater*, 94 F.3d 520, 522 (holding no abuse of discretion by administrative law judge who relied upon findings of nonexamining physician).

In sum, none of the evidence proffered by Plaintiff constitutes probative, material evidence that MetLife violated its duty as fiduciary because of its inherent conflict of interest. Accordingly, the Court will apply an abuse of discretion standard of review to Plaintiff's claim.

### 3. Abuse of Discretion Review

Plaintiff asserts that even if the Court applies the abuse of discretion review, it will find that MetLife's denial of Plaintiff's claims was arbitrary and capricious and, therefore, should be reversed.

■ The Ninth Circuit uses the terms arbitrary and capricious and abuse of discretion interchangeably. *See Barnett v. Kaiser Foundation Health Plan, Inc.*, 32 F.3d 413, 415 (9th Cir.1994). Under this standard, a decision must be upheld unless it is "not granted on any reasonable basis" or is determined to be "clearly erroneous." *Horan v. Kaiser Steel Retirement Plan*, 947 F.2d 1412, 1417 (9th Cir.1991); *Jones v. Laborers Health & Welfare Trust Fund*, 906 F.2d 480, 482 (9th Cir.1990).

The broad deference granted to plan administrators means that even if a decision directly conflicts with evidence in the record, the decision may still be upheld. *See Taft*, 9 F.3d at 1474. When reviewing an ERISA benefits decision for abuse of discretion a court may not "substitute its judgment for that of the administrator unless the latter's decision was clearly erroneous in light of the available record." *Voight*, 28 F.Supp.2d at 576 (citing *Taft*, 9 F.3d at 1473).

Plaintiff scatters numerous arguments as to the unreasonableness of MetLife's determination through its various motion papers. The Court will address the strongest of these arguments below.

### a. Plaintiff Mischaracterizes the Reasons for MetLife's Denial

Plaintiff repeatedly argues that MetLife erred by demanding objective evidence of her fibromyalgia. Because doctors diagnosed her as exhibiting the only two objective signs of fibromyalgia (trigger points and widespread pain), Plaintiff contends that MetLife's conclusion that she lacked sufficient evidence is incorrect.

However, this argument mischaracterizes the basis for MetLife's denial of Plaintiff's claim. In each letter to Plaintiff, MetLife indicated that she had to establish that she was disabled under the Plan's terms. The Plan defines total disability as

being "unable to perform all the normal duties of your regular occupation... due to your disability." MetLife appears to have accepted that Plaintiff suffered from fibromyalgia. *See, e.g.* Pl.'s Exhs. 20, 29. However, as MetLife made clear in its responses to Plaintiff's doctor's letters and reports indicating this diagnosis, this diagnosis alone did not necessarily mean that Plaintiff was disabled under the Plan's definition. *See* Pl.'s Exh. 29 ("You have provided a diagnosis of fibromyalgia. Based on her diagnosis, please explain what prevented your patient from performing her occupation as administrative secretary which is a sedentary position...").

The record reveals that MetLife applied this same approach throughout Plaintiff's case. In each denial letter it quoted the same definition of disability and then explained that, although Plaintiff exhibited symptoms of fibromyalgia, Plaintiff did not meet the definition of disability under the Plan.[6] *See* Pl.'s Exhs. 20, 36, 42. Given that MetLife has discretionary authority to construe the terms of the Plan, and that it consistently applied its standards in this case, the Court does not find that MetLife's requirement that Plaintiff prove that she was totally disabled, rather than just prove that she has fibromyalgia, constitutes an abuse of discretion.[7] *See Finley v. Special Agents Mut. Ben. Ass'n*, 957

---

6. Plaintiff argues in her reply that the Plan's definition of disability is ambiguous because it could be read to mean either that if Plaintiff could not perform *every one* of her duties she was disabled or that if Plaintiff could not perform *any* of her duties (because then she could not perform all of them) she was disabled. *See* Pl.'s Reply at 6–7.

Plaintiff contorts the Plan's language to create ambiguity where none exists. The language sets a high standard for total disability: only where a disability prevents an applicant from performing every single part of his or her job description for 18 months, can he or she qualify for benefits. In other words, if Plaintiff could still answer the phone, even if she could not file, could not write letters, or sit in meetings, she would not be classed as totally disabled under the Plan.

Of course, this does not mean that MetLife applied this definition literally. *See Saffle v. Sierra Pacific Power Co.*, 85 F.3d 455, 458–59 (9th Cir.1996) (holding that a literal interpretation of total disability as absolute helplessness is unreasonable). For the reasons explained below, the Court does not find evidence in the record that a MetLife representative or physician retained by MetLife found that Plaintiff's claim had to be denied because she remained able to perform at least one material duty of her job. *See Voight*, 28 F.Supp.2d at 578.

7. Because MetLife did not deny Plaintiff's claim based on a failure to provide objective evidence that she suffered from fibromyalgia, the multiple cases cited by Plaintiff to establish that requiring objective proof of fibromyalgia would be impossible are irrelevant.

F.2d 617, 621 (8th Cir.1992) (including whether plan administrator has consistently interpreted the plan and whether the interpretation is contrary to the clear language of the plan among the factors to be considered in determining whether the denial of benefits constitutes an abuse of discretion); *cf. Lang,* 125 F.3d at 799 (finding inconsistent reasons for termination of benefits probative evidence that decision was affected by self-interest and, therefore, subjecting administrator's decision to de novo review).

■ The harder question is whether MetLife abused its discretion by finding that Plaintiff had not provided sufficient "objective evidence" that she was, in fact, totally disabled. There is some split of authority as to whether requiring objective evidence constitutes an abuse of discretion where, as here, the plan administrator has not indicated with particularity what objective evidence could be supplied. *Compare Voight,* 28 F.Supp.2d at 578 ("It was not unreasonable for MetLife to require objective evidence as 'proof' of total disability.") *with Mitchell v. Eastman Kodak Company,* 113 F.3d 433, 441 (3d Cir.1997) (holding abuse of discretion for administrator to conclude that doctor's descriptions of plaintiff's symptoms did not amount to disability where administrator failed to identify any more objective evidence that plaintiff could have submitted).

But upon closer review of these cases, it is apparent that although plans use the term "objective" evidence, courts make their evaluation on the basis of whether an applicant has presented sufficient evidence in general, subjective or not. Thus, for example, in *Voight,* 28 F.Supp.2d at 578, the court found insufficient evidence of a total disability where, in addition to the plaintiff's subjective complaints, the record contained conflicting evaluations from medical professionals. The court found that the plan administrator had sufficiently explained its decision to favor one set of doctors over another. *Id.* at 579. Accordingly, although the district court acknowl-

edged that reasonable minds could disagree as to the administrator's decision, it was not an abuse of discretion. *Id.* at 580.

In contrast, the court in *Mitchell,* 113 F.3d at 440, was presented with "undisputed evidence" showing that the applicant could not sustain regular paid employment because he suffered from chronic fatigue syndrome. Plaintiff's doctors wrote detailed letters cataloging Plaintiff's symptoms. *Id.* at 441–42. Experts in the field discussed the new understanding of plaintiff's illness. *Id.* In rejecting plaintiff's benefits claim, however, the administrator issued only "terse" letters which merely stated that plaintiff failed to tender "objective medical evidence" that he was disabled under the plan's terms. *Id.* at 442. Because the uncontroverted evidence showed that plaintiff was disabled, the Third Circuit Court of Appeals found it arbitrary and capricious for the administrator to deny plaintiff's claim solely for lack of objective evidence. *Id.* at 443.

The Court's review of the record reveals that, as with the illnesses at issue in *Voight* and *Mitchell* certain "objective evidence" of disability beyond proof that Plaintiff did, indeed, suffer from fibromyalgia may be difficult to obtain. Yet even allowing for some subjective evidence based on Plaintiff's complaints of pain, the Court finds that MetLife did not act arbitrarily in denying Plaintiff's claim. First, Plaintiff's own descriptions of her condition suggests that while her activities are limited, she can still perform physical tasks that are much more arduous than her job requires. *See* Pl.'s Exh. 11 (reporting that Plaintiff can climb stairs, mop, cook, and do laundry, albeit with difficulty and not as frequently as before her condition). Additionally, Plaintiff conceded in this report that "the diagnosis varies" as to whether she will be able to return to work. *Id.*

Second, even though Plaintiff's doctor's reports indicate that she suffers from fibromyalgia, these reports are somewhat equivocal as to whether Plaintiff's condi-

tion hampered her ability to perform a sedentary job. For instance, in a report dated June 6, 1995, Dr. Nelson indicated that she was "in no acute distress" and "freely ambulatory." Pl.'s Exh. 7. Another noted that she had no significant arthritis or other connective tissue condition. *See* Pl.'s Exh. 8. EMG test results even as late as April 1996 yielded "essentially normal" results. A.R. at D80. Similarly, in a report dated July 21, 1995, Dr. O'Connor noted that Plaintiff tested negative for a range of muscular and skeletal conditions and opined that she had "no proximal muscle weakness," "full range of motion," "no significant synovitis" and "good hands and knees." Pl.'s Exh. 8.

Plaintiff's symptoms do not even match the nature of the symptoms she asserts are associated with fibromyalgia. Plaintiff's definition describes fibromyalgia as often "[p]art of a wider syndrome encompassing headaches, irritable bladder, dysmenorrhea, cold sensitivity, Raynaud's phenomenon, restless legs, atypical patterns of numbness and tingling, exercise intolerance, and complaints of weakness." *Monroe v. Pacific Telesis Group Comprehensive Disability Benefits Plan,* 971 F.Supp. 1310, 1311 (C.D.Cal.1997) (quoting a doctor's report quoting a 1990 study of the American College of Rheumatology).[8] Neither Plaintiff nor her doctors aver that Plaintiff suffered from any of these ailments.

Third, and most significantly, MetLife's denial followed conflicting reports from medical professionals. Although Plaintiff's

doctors, one of whom was a specialist in connective tissue disorders, opined that Plaintiff was disabled, these opinions were not accompanied by any significant explanation. *Compare Mitchell* 113 F.3d at 441 (assessing doctor's reports which discussed in detail elusive nature of chronic fatigue syndrome, difficulty of treating disease, and plaintiff's wide range of symptoms). In fact, Plaintiff's doctors failed to provide more information as to her condition even after Plaintiff's claim had been rejected. Instead, Dr. Reddy submitted almost word-for-word the same, three-sentence, conclusory report. *Compare* Pl.'s Exhs. 31, 39. In contrast, MetLife's independent rheumatology expert submitted a lengthy evaluation, including an explanation as to why Plaintiff's fibromyalgia would not prevent her from performing sedentary work and potential treatment programs.

**b. MetLife's Decision Was Not Based on Clearly Erroneous Factual Findings**

██ Plaintiff's other major contention is that it was unreasonable for MetLife to ignore the opinions of physicians who had treated her on a regular basis in favor of opinions formed by doctors who only reviewed the case file. Because Plaintiff's treating physicians declared that she was disabled, Plaintiff asserts, MetLife's denial of Plaintiff's claim was erroneous.

Contrary to Plaintiff's contention, both of MetLife's appointed medical reviewers, Drs. Rodgers and Lieberman, appear to have been independent.[9] Dr. Rodgers, an

---

**8.** Although it is true that the district court in *Monroe* found an abuse of discretion where the plan participant experienced similar symptoms of fibromyalgia as Plaintiff, this case is distinguishable. In *Monroe,* the plaintiff's own doctor, and defendant's doctor, both of whom were rheumatologists, diagnosed Plaintiff's condition as totally disabling. 971 F.Supp. at 1313. The only contrary evidence came from a defendant's internist who examined plaintiff twice for five minutes each time. Here, in contrast, the rheumatology experts provided conflicting diagnoses. Moreover, MetLife's expert provided the more

detailed analysis of whether Plaintiff's condition amounted to a total disability.

**9.** Plaintiff insinuates that the doctors were not independent because they were on MetLife's payroll. Plaintiff presents no evidence at all regarding Dr. Rodgers. *See* Pl.'s Opp'n at 8 ("We know that Dr. Rodgers was on the payroll, because he never even submitted a bill for his time."). The evidence in the record reflects that Dr. Lieberman worked for the DeKalb Medical Specialty Center in Decatur, Georgia and billed MetLife for an "independent medical exam." A.R. at D104–06.

internist, reviewed Plaintiff's file twice and found Plaintiff had not provided evidence of her disability. His notes indicate that he attempted to call both Dr. Nelson and Dr. O'Connor to discuss Plaintiff's condition on several occasions, but that his calls were not returned. *See* A.R. at D102–03.

MetLife then determined it was appropriate to submit Plaintiff's file to a specialist for review. In his September 26, 1996 report, Dr. Lieberman explained at length the reasons for his belief that Plaintiff was not totally disabled from performing her duties as an administrative secretary. *See* Pl.'s Exh. 34. He noted several concerns about Plaintiff's medical treatment. In particular, he noted that Dr. Nelson prescribed Medrol dose packs, which are not indicated for the treatment of fibromyalgia. He also raised concern about Dr. O'Connor's conclusions. Dr. O'Connor was the only rheumatologist treating Plaintiff. Yet, according to Dr. Lieberman, he used an incorrect measure of the number of tender points for fibromyalgia.[10] In addition, Dr. Lieberman pointed out that Dr.

O'Connor failed to specifically educate Plaintiff regarding her condition or to prescribe a regiment of exercise, both of which he deemed essential, and without which "most patients will not respond to treatment." Finally, Dr. Lieberman indicated that Dr. O'Connor diagnosed Plaintiff as suffering from post parvovirus arthritis, but did not have laboratory support for this contention. This condition usually resolves itself within a short period, according to Dr. Lieberman, which Dr. O'Connor did not reveal in his various reports.

MetLife provided Plaintiff's doctors a chance to respond to Dr. Lieberman's analysis, yet none chose to do so. As stated above, Dr. Reddy only issued a conclusory statement of Plaintiff's total disability without any reference at all to Dr. Lieberman's analysis.

██ Even though the doctors selected by MetLife disagreed with Plaintiff's physicians' conclusion, MetLife made its decision on the basis of sufficient evidence.[11]

Plaintiff's assertion is based on a misinterpretation of claim reviewer Anne Stanton's testimony. When viewed as a whole, Stanton's testimony makes clear that although Dr. Lieberman reviewed claims for MetLife, she was not sure what the relationship was. *See* Stanton Depo. at 44 (Q. [Dr. Lieberman] is an employee of MetLife? A. I don't really know if he comes into the office in Atlanta or if—I'm not sure how—what the relationship is. He reviewed claims for us. I know that.).

10. Plaintiff has submitted proof that the American College of Rheumatology used the 19–point test for fibromyalgia until 1990. *see* Pl.'s Exh. 49 (American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia). Although this undercuts the strength of Dr. Lieberman's position somewhat, the Court still finds it relevant that a specialist uses a test which was outdated by more than five years.

11. At oral argument, Plaintiff referred for the first time to the case of *Donaho v. FMC Corp.*, 74 F.3d 894 (8th Cir.1996), and also relied on *Marecek v. BellSouth Telecommunications Inc.*, 49 F.3d 702 (11th Cir.1995), to argue that Dr. Lieberman's report was equivocal and, therefore cannot properly serve as the basis for finding that Plaintiff is not disabled.

Plaintiff points to the fact that Dr. Lieberman states that Plaintiff "should be capable of sedentary work," and then sets forth a description of treatment program and accommodations in the work place, such as lighting and wrist rests for computers. Plaintiff further relies on Dr. Lieberman's conclusion that, "If these matters are attended to I do not see any work restrictions related to her job description dated 6/94."

Plaintiff asserts that this statement is equivocal because Dr. Lieberman is merely stating that Plaintiff *could* be able to work in the future *if* certain precautions are taken. The Court does not agree with this interpretation. When Dr. Lieberman's letter is considered as a whole, it is clear that these are recommendations to make Plaintiff's adjustment to work easier, not conditional statements that "with treatment" she "might" be able to do so. Dr. Lieberman found the severity of Plaintiff's fibromyalgia to be only "moderate," and did not state that she was disabled or incapable of returning to work for a certain period. Dr. Lieberman's accommodation suggestions merely recognize what has never been in doubt: that Plaintiff does experience certain pain and fatigue problems associated with fibromyalgia. The Court takes his recommen-

*See Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446, 1452 (11th Cir.1997) (holding administrator justified in denying plaintiff's claim despite treating physician's conclusion that plaintiff was disabled); *Voight,* 28 F.Supp.2d at 579 (same); *Steinmann,* 863 F.Supp. 994 (E.D.Mo.1994) (affirming plan administrator's denial on grounds that there was insufficient evidence of disability in spite of treating physician's conclusion that claimant was disabled). The opinions MetLife relied on were neither unreasonable nor unsupported. Dr. Lieberman's report in particular explained his reasons for differing with Plaintiff's doctors.

Many of Plaintiff's doctors, as well as Plaintiff's subjective descriptions, if not their ultimate conclusions, actually aligned with the conclusions drawn by Drs. Lieberman and Rodgers. Yet even if Plaintiff's analyses did not provide support to MetLife's decision, the mere fact that MetLife favored the opinions of the independent medical reviewers is not proof of arbitrary or capricious conduct. *See Sweatman v. Commercial Union Ins. Co.,* 39 F.3d 594, 602 (5th Cir.1994) (denial of benefits not an abuse of discretion where administrator based its decision on opinions of medical consultants which were contrary to those of plaintiff's physicians); *Sandoval,* 967 F.2d at 382 (upholding administrator's decision where review committee remarked upon the conflicting medical opinions and chose to follow independent evaluator's decision over treating physician).

Based on the Court's review of cases, it has some concern that administrators may misuse the "objective evidence" requirement to justify denying all claims for medical conditions which do not lend themselves to measurable scientific proof of their debilitating effects. Where objective evidence is hard to establish, it can hardly be sufficient for an administrator to point to the absence, provide no way of curing this absence and, then, to deny the claim. On the other hand, an abuse of discretion does not lie where an administrator has weighed all of the evidence presented and determined that an applicant has simply not provided enough persuasive evidence that she suffers from a total disability. The Court finds that MetLife's decision falls into the latter category. As the *Voight* court noted, " 'Reasonable minds' " [could accept the independent reviewer's] conclusions.... Reasonable minds might also disagree, but it was not so clearly erroneous as to constitute an abuse of discretion." *Voight,* 28 F.Supp.2d at 580 (citing and quoting *Snow,* 87 F.3d at 332;

---

dations as attempting to minimize Plaintiff's discomfort at work.

Dr. Lieberman's recommendations are distinguishable from the physicians' statements in *Donaho* and *Marecek* on which Plaintiff relies. In *Donaho,* one of the insurance company's reviewing doctors concluded that, "while Donaho had only a limited ability to complete assigned tasks and to function independently, she 'should respond to the suggested pharmacologic approaches, and thus she will be able to resume working.' " *Donaho,* 74 F.3d at 897. The Eleventh Circuit determined that the plaintiff was entitled to disability benefits at least until the date of the doctor's report because he indicated that Donaho was still disabled at the time of the report, but could recover in the future. *Id.* at 900. Unlike Dr. Lieberman's report, the physician in Donaho's future prediction was premised upon a definite statement of present inability to work. In addition, the doctors suggested the conditions were of such severity that they needed a pharmacological treatment in order to be cured. *Id.* at 897.

The physician in *Marecek* also made a strong statement of present disability noting that the Plaintiff could not return to work for at least a month, but set an "estimated date" by which she would be ready to return. *Marecek,* 49 F.3d at 704. Because plaintiff's physician prescribed medication for plaintiff's condition, the physician further warned that plaintiff could experience side effects. *Id.* Even to the extent that the doctor made a prediction about plaintiff's return to work date, he recommended that she only perform "limited duty." Dr. Lieberman, in contrast, did not recommend any delay in Plaintiff's return to work. Nor did he suggest that Plaintiff's duties be limited to accommodate her condition. For these reasons, the Court finds that Dr. Lieberman's statements provide unequivocal evidence on which MetLife could reasonably base its benefits decision.

*Sandoval,* 967 F.2d at 382). Accordingly, the Court will not substitute its own judgment for that of MetLife in this case.

### III. Conclusion

For all of the reasons set forth above, the Court hereby ORDERS that Defendants' motion for summary judgment is GRANTED and Plaintiff's motion for summary judgment is DENIED.

**SO ORDERED.**