Steven A. **MARTIN**, Plaintiff,

v.

**CONTINENTAL CASUALTY COMPANY**, Defendant.

No. C 98–2177 MJJ.

United States District Court,
N.D. California.

April 11, 2000.

Kathleen Kresnak, Desouza Law Offices, Berkeley, CA, Jacqueline Desouza, Desouza Law Offices, Berkeley, CA, Edward McCutchan, DeMeo & DeMeo, Santa Rosa, CA.

Edward McCutchan, DeMeo & DeMeo, Santa Rosa, CA, for plaintiff.

Kathleen Kresnak, Jacqueline DeSouza, Desouza Law Offices, Berkeley, CA, for defendants.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JENKINS, District Judge.

### INTRODUCTION

Before the Court is defendant's motion for summary judgment. For the reasons outlined ill this memorandum and order, the Court hereby GRANTS defendant's motion.

### FACTUAL BACKGROUND

This is an ERISA denial of benefits case, brought by Steven Martin ("Martin"). Beginning ill 1997, Martin, who was then a senior underwriter at AIG insurance company, began to consult physicians regarding neck and shoulder pain and fatigue. Martin underwent surgery on his right rotator cuff in February 1997, and saw several practitioners for chronic pain thereafter. In September 1997, Martin submitted a claim for total disability to AIG's ERISA plan, which is funded and managed by defendant Continental Casualty Company ("Continental").[1]

The record reflects four separate administrative denials of Martin's disability claim. To support his initial claim, Martin submitted his hospital records from two treating physicians. Continental reviewed Martin's claim, and denied it on November 13, 1997. Before appealing of right, Martin submitted follow-up reports from two doctors to the initial reviewer. On December 24, 1997, Continental upheld its initial denial after considering the additional information.

Martin then availed himself of his appeal right, and Continental's appeals board submitted his file to an independent physician for review. Based in part on the reviewing physician's conclusion that Martin had not demonstrated total disability within the meaning of the policy language, Continental denied Martin's appeal on March 30, 1998.

After his appeal was denied, Martin filed this lawsuit. During the pendency of this litigation, Martin was initially diagnosed by one doctor as having post-polio syndrome. On the basis of this diagnosis, the parties stipulated to a de novo review of Martin's claim, including the new evidence. Martin submitted the reports of five additional practitioners. Continental reviewed the submission de novo, and on July 1, 1999 again denied Martin's claim.[2]

---

1. Because Continental, an insurance company, runs the plan, this is analogous in its fiduciary implications to a traditional "self-funded" ERISA plan operated and funded by the employer. Thus, Continental is properly subject to the Court's review for self-interested determinations outlined in Atwood, infra.

2. The July 1, 1999 denial letter included language indicating that Martin had an appeal right from that denial. Upon Martin's attempt to exercise that appeal right, Continental clarified that the language, which is standard in any initial denial of coverage, was inadvertently included in the letter and Continental accordingly refused to review its deci-

Now before the Court is Continental's motion for summary judgment. Relying on the stipulation of the parties, Continental asserts that an abuse of discretion/arbitrary and capricious standard applies, and that Continental's denials of coverage comply with this standard as a matter of law.

Martin concedes that the policy on its face reserves discretion to the plan, and therefore has no qualm with the abuse of discretion as the nominal standard of review.[3] However, Martin claims that because Continental itself funds the plan, thereby creating the potential for self-interested decisionmaking, serious questions as to a conflict of interest arise and, under Ninth Circuit law, the *de novo* standard ultimately should apply. Martin argues that Continental's denials reflect an unreasonable treatment of his claim under either standard. Martin alleges that Continental engrafted standards not within the purview of plan language to deny his claim, namely (1) that "objective medical evidence" be offered to support his claim and (2) that the evidence demonstrate he was not well enough to fill a "sedentary position." Moreover, Martin alleges that in denying his claim, Continental impermissibly overlooked objective evidence that supported the grant of permanent disability status.

## LEGAL ANALYSIS

### I. Evidentiary Analysis

#### A. Plan Language

Continental's plan provides benefits to beneficiaries for, *inter alia,* total disability. That term is defined as follows:

"The Insured Employee because of Injury or Sickness is:

(1) Continuously unable to perform the substantial and material duties of his regular occupation;

(2) Under the regular care of a licensed physician other then himself;

(3) Not gainfully employed in any occupation for which he is or becomes qualified for by education, training or experience."

In the plan's denial letters to Martin, it is stated that "the attending physician must be able to provide objective medical evidence to support his/her opinion as to why you are not able to perform the duties of your occupation. Medical evidence means medical signs and findings established by medically acceptable diagnostic techniques which show the existence of a medical impairment that results from an anatomical, physiological, or psychological abnormality which could reasonably be expected to produce pain, or other symptoms alleged. Subjective complaints alone shall not be considered conclusive evidence of disability." *See, e.g.,* Towne Decl., Exh. A.

### B. Initial Denial: November 13, 1997

Martin submitted two doctors' opinions in support of his initial claim, those of Dr. Roberts and Dr. Smith.[4] Dr. Roberts' initial report, dated August 14, 1997, described a cumulative trauma to Martin's neck and upper extremities owing to his work activities. Dr. Roberts operated on Martin's shoulder in January 1997, undertaking a "decompression" of that area. Dr. Roberts' diagnosis for Martin was (1) degenerative disk disease and (2) overuse/repetitive injury syndrome in his shoulders and arms. The report mentions Martin's history of pediatric polio, but does not go any further. Dr. Roberts' report stops short of a finding of total disability, suggesting either alternative physical therapy, a repeat MRI on the shoulders, and/or treatment at a pain clinic.

Dr. Smith's report, dated September 8, 1997, diagnosed Martin as "permanent, stationary and rateable with regard to de-

---

sion. Towne Decl., ¶ 8; Kresnak Decl., Exh. A.

**3.** Hence the parties' earlier stipulation to utilize an abuse of discretion standard.

**4.** The file also contains the ongoing notes of Martin's primary physician, Dr. Senecheck. These notes do not form a substantive basis for either party's arguments.

generative disk disease cervical spine resulting in chronic ligamentous pain failing all forms of conservative management attempted, status post right shoulder arthroscopic subacromial decompression." Dr. Smith concluded that neither physical therapy, chiropractic management or acupressure were necessary.

On November 13, 1997, disability specialist Catherine Towne denied Martin's claim. After delineating the chronology of his treatment, including the reports of Drs. Smith and Roberts, Towne concluded that "[t]he medical information we now have in the file does not support your position of total disability from performing your own occupation as a senior underwriter.... There are no medical facts or findings established by medically accepted diagnostic techniques which verify the existence of a medical impairment that would be so significant that it would debilitate you to the point that you could not function to perform the duties of your job. There were no clinical findings or test findings that could reasonably be expected to produce your alleged pain and symptoms. Your pain was considered, but your continued self-reported complaints are disproportionate to the medical facts and physical findings."

### C. Follow–Up Denial: December 24, 1997

Upon the initial denial by Towne, Martin submitted additional information to her before availing himself of his appeal right. Martin provided (1) a follow–up report from Dr. Roberts, and (2) a report from a Dr. Spanos. Dr. Roberts' second report, dated December 4, 1997, gave far more diagnostic detail than his initial report, and made new findings, among them that Martin "has a long history dating back to 1995 of what appears to be an intractable pain syndrome", and most significantly that "[t]he patient is not going to be able to return to his work as a commercial underwriter because of the repetitive work tasks involved in the same."

Dr. Spanos, an acupressurist and hypnotherapist, reported in his November 30,

1997 letter of substantial improvement in Martin's pain levels in response to muscle massage. "With continued treatments, I believe that Mr. Martin can regain a great deal of his former capacities, and probably reach a lace of at least low level pain, if not freedom from the constant pain.... Given his response and dramatic improvement through the work we have done, this would indicate that the majority of the problem is muscular in nature."

Towne's second denial again concluded that "[t]he preponderance of the medical evidence we now have in file did not support the alleged pain to be medically reasonable nor did it establish a disabling condition so severe as to prevent you from performing the substantial and material duties of your own occupation as a senior underwriter."

### D. Denial by Appeal Board: March 30, 1998

On his appeal to the independent board, Martin submitted the four reports discussed in sections B and C *supra*. The Appeals Board referred Martin's file to its independent evaluator, Dr. Truchelut, for his review. Dr. Truchelut's report on the file concluded that no finding of disability is warranted. "His physicians indicate that his problem appears to be soft tissue in nature. He appears to be capable of light sedentary work, especially if he can take a normal amount of breaks as Dr. Roberts has indicated. I do not believe the objective medical findings from any of his records would support an exclusion of the return to his work as a commercial underwriter, especially if the job could be modified to allow breaks in the monotony. To say that he could not return to this type of work would be to essentially say that he is confined to a less than sedentary life style, and there is just no sound evidence in the file to lend support to that."

Based on the independent report, the Appeals Committee denied Martin's appeal on March 30, 1998. The denial letter noted that Martin's job allowed him the flexi-

bility to control the amount of sitting and standing, and gave him the flexibility to take breaks, as Dr. Roberts' follow-up report had indicated was necessary. The letter concluded that "there are no objective findings in Mr. Martin's file either via physical examination or other studies including X-rays, MRIs, bone scan, or EMG to support that Mr. Martin's impairment is so severe as to prevent him from performing the material and substantial duties of his own occupation as a Senior Underwriter."

### E. Denial on Stipulated *De Novo* Review: July 1, 1999

As stipulated by the parties, Martin's claim was submitted to the plan for *de novo* review in 1999. In addition to the reports enumerated at sections B–D *supra*, Martin also submitted reports from the following doctors: (1) Dr. Davis; (2) Dr. Kako; (3) Dr. Kasavin; (4) Dr. Wakasa (two separate reports); and (5) an additional report from Dr. Roberts.

Dr. Davis' report, dated March 23, 1998, concluded that Martin "is suffering from a chronic pain syndrome superimposed on possibly a component of underlying psoriatic arthritis. Certainly, his degree of subjective symptomatology is greater than what I find on physical examination. Thus, I feel the major therapeutic thrust should be a slowly increasing exercise program."

Dr. Kako, an internist, performed a general physical exam on Martin on July 11, 1998 and concluded that "I think given his presentation and history, it would be most appropriate for him to do mostly sedentary work, avoiding repetitive motions if possible; perhaps cutting his work day to 6 hours. He should be able to sit for 1 to 1½ hours at a time, allowing him to change positions with the usual and customary breaks. In all likelihood, he is permanent and stationary at this level."

Dr. Kasavin's report of May 20, 1998 was the first chronologically to raise the possibility that Martin has post-polio syndrome, but she ultimately concludes that Martin does not have the disease. "The patient suffers from chronic pain that involves different areas of his body. The question is whether he suffers from a post-polio syndrome ... Clinical features of a post-polio syndrome include progressive weakness, fatigue that does not correlate with the weakness, and muscle and joint pains. Currently, the diagnosis of post-polio syndrome requires a credible history of poliomyelitis and, most importantly, progressive weakness that cannot be explained otherwise.... I do not believe that Mr. Martin has a post-polio syndrome because he has no weakness."

On August 31, 1998, three months after Dr. Kasavin's report, Dr. Wakasa concluded that Martin in fact had "classic post-polio syndrome. His symptoms are affecting him in significant ways in diffuse upper and lower extremity joint and muscle with overall disabling fatigue and new weakness, beginning to mainly affect his right lower extremity." Thus, in the intervening three months since Dr. Kasavin's report, Martin developed the post-polio syndrome symptom (weakness) found initially lacking. Dr. Wakasa recommended the incorporation of lie-down rest periods in Martin's daily life, and "a severe decrease in activity". Dr. Wakasa issued two brief follow-up letters the next month, the first on September 22 a two-liner stating that Martin "is permanently disabled from work due to the late effects of polio", and the second of September 27 an only slightly more explanatory letter again stating that Martin had been diagnosed with post-polio syndrome, concluding "I believe that the patient would most benefit from not working in the traditional sense of his work in an office setting."

Dr. Roberts' third report, dated November 18, 1998, reiterated the gist of his prior reports, and relied upon Dr. Wakasa's new findings in supplementing his diagnoses. "Dr. Wakasa diagnosed Mr. Martin as having a post-polio syndrome and finds his unusual in the sense that generally the original affected polio areas are most pro-

foundly affected by the post-polio syndrome. Mr. Martin has an atypical post-polio syndrome, as I understand Dr. Wakasa and Mr. Martin to explain it, because he has a generalized weakness and fatigue in the original polio affected areas. Mr. Martin has become very involved in the post-polio network, and he actually found Dr. Wakasa through this network." In this third report, Dr. Roberts supplemented his initial diagnoses with the finding of "post-polio syndrome with attendant weakness, fatigue, and nerve pain." As Dr. Roberts, an orthopedic surgeon, initially undertook care of Martin because of shoulder pain, his report also diagnoses a complete recovery from the industrial injuries, and finds that but for the post-polio syndrome, Martin would have been able to return to normal duties. "Following today Mr. Martin's diagnosis would exclusively be that of post-polio syndrome with no residuals of the industrial injury ... Mr. Martin understands that I am not an expert in post-polio syndrome, so I have tried to make a common sense, medical-legal, disposition on this gentleman, which I hope his treating physician and the other parties of the AME can accept."

Dr. Truchelut was again asked by the plan to conduct an independent review of Martin's file. After reviewing all of the new opinions, Dr. Truchelut again concluded that the record did not support a finding of total disability. "To answer your specific question, the addition [sic] medical information does not change my original opinion; please refer to the last paragraph of my previous dictation. It appears to be some disagreement among examining physicians as to whether he had a post-polio syndrome, but even if this diagnosis is correct, there is no objective evidence that he has such a severe physical functional impairment that he could not perform sedentary job activities. Even the most recent restrictions given to him by Dr. Wakasa would not precluded [sic] him from

most sedentary jobs, when changes in position are possible. There is no indication that he had less than full use of his upper extremities, even if his movements are voluntarily slowed. I would also note that the claimant's activities of daily living as reported by Dr. Wakasa on ⅜ [sic; 3/30] are certainly consistent with a sedentary or light work category."

Continental's letter of July 1, 1999 denying Martin's claim *de novo* quoted almost verbatim the above passage from Dr. Truchelut's report.[5]

## II. Legal Standards

### A. Abuse of Discretion Standard

█ A denial of ERISA benefits is reviewed *de novo* unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The parties have previously stipulated that an abuse of discretion applies. Martin again concedes this standard in his opposition brief, albeit with an argument for the more searching review contemplated by the *Atwood* case, *infra.*

█ Where discretion is accorded, the Ninth Circuit reviews the record under the abuse of discretion standard, which has been equated with the arbitrary and capricious standard. *See Snow v. Standard Ins. Co.,* 87 F.3d 327, 330 (9th Cir.1996) and cases cited. The touchstone of this standard is reasonableness. "Our inquiry is not into whose interpretation of plan documents is most persuasive, but whether the plan administrator's interpretation is unreasonable." *Clark v. Washington Teamsters Welfare Trust,* 8 F.3d 1429, 1432 (9th Cir.1993).

---

5. That letter made reference to another round of appeal as of right, but Continental now claims that offer was an "inadvertent mistake" owing to the inclusion of boilerplate language with regard to plan-based review, in contrast to this *de novo* appeal, which was a creature of the parties' litigation stipulation. Kresnak Decl., Exh. A.

Thus, the standard mandates some deference to the plan administrator's decision. Substituted judgment is inappropriate. *Taft v. Equitable Life Assurance Soc'y,* 9 F.3d 1469, 1473 (9th Cir. 1993). It is an abuse of discretion for an administrator to make a decision without any explanation, or in a way that conflicts with the plain language of the plan, or that is based on clearly erroneous findings of fact. *Atwood v. Newmont Gold Inc.,* 45 F.3d 1317, 1323–24 (9th Cir.1995). Significantly, a decision should not be overturned where there is "relevant evidence that reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Snow,* 87 F.3d at 331, *citing Maynard v. City of San Jose,* 37 F.3d 1396, 1404 (9th Cir.1994). The fact that an administrator's decision is in conflict with evidence in the record is not alone sufficient to meet the clearly erroneous standard. *Taft,* 9 F.3d at 1473–4. Instead, a "firm and definite conviction that a mistake has been committed" is necessary to meet this standard. *Id.* The Ninth Circuit has found an abuse of discretion where the insurer overruled a physician's diagnosis despite the fact that (1) the insurer's physician was not an expert in the relevant field; (2) the insurer did not consult with the treating physician; and (3) the insurer did not perform an examination of the plaintiff. *Zavora v. Paul Revere Life Ins. Co.,* 145 F.3d 1118 (9th Cir.1998).[6] *See also Isabel v. Hartford Life,* 1999 WL 38854 (N.D.Cal.1999) (Smith, J.) (applying *Zavora* to remand case where no independent examination conducted and treating physician's opinion overruled).

It is clear that no evidence outside the administrative record is to be considered when an abuse of discretion standard is employed. *Taft,* 9 F.3d at 1472 ("Permitting a district court to examine evidence outside the administrative record would open the door to the anomalous conclusion that a plan administrator abused its discretion by failing to consider evidence not before it.")[7] The interesting question here is the status of the additional information generated since the institution of this litigation, upon which Continental has conducted a *de novo* review *pendente lite.* The parties have stipulated that those additional portions of the record, which are the only portions documenting a diagnosis of post-polio syndrome, are properly before the Court on this motion. When an abuse of discretion standard obtains in the ERISA context, a motion for summary judgment is the conduit to bring the legal question before the district court, and the usual tests of summary judgment do not apply. *Bendixen v. Standard Insurance Co.,* 185 F.3d 939, 942 (9th Cir. 1999).

## B. *Atwood* Rule Regarding Serious Questions of Conflict of Interest

Even where a plan's reservation of discretion dictates an abuse of discretion/arbitrary and capricious standard of review, a more searching level of review, rising to a *de novo* standard, may be warranted where a conflict of interest exists, *i.e.* the employer is also the plan administrator. Conflicted fiduciaries are not entitled to deference, as a denial raises the possibility of self-interest. The Ninth Circuit in *Atwood* outlined the standard of proof as to such a claim. "First, we must determine whether the affected beneficiary has provided material, probative evidence,

6. In Dr. Truchelut's deposition, he admits not to have examined Martin personally, nor did he contact any of the treating physicians to discuss their reports. Dr. Truchelut does claim some familiarity with post-polio syndrome, and was able to recite a typical pathology, but does not consider himself an expert on the topic. Dr. Truchelut claims that even taking Wakasa's diagnosis as true, the diagnosis does not support a total disability finding with the plan's definition of the term.

7. Even under a *de novo* standard, extrinsic information can be considered only in the limited circumstance where additional evidence is necessary to conduct an adequate *de novo* review of the record. *See, e.g., Mongeluzo v. Baxter Travenol,* 46 F.3d 938 (9th Cir. 1995).

beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary. If not, we apply our traditional abuse of discretion review. On the other hand, if the beneficiary has made the required showing, the principles of trust law require us to act very skeptically in deferring to the discretion of an administrator who appears to have committed a breach of fiduciary duty." *Atwood*, 45 F.3d at 1323. Where needed, that skepticism amounts to a *de novo* standard of review. *Id.*

Since *Atwood*, the Ninth Circuit has only once addressed the beneficiary's showing necessary to trigger the *de novo* standard. There, the plan gave inconsistent reasons for its refusals to lift a limitation in the plan; the court found that these inconsistent justifications by an employer-run plan constituted "material, probative evidence that its decision was affected by self-interest." *Lang v. Long–Term Disability*, 125 F.3d 794, 799 (9th Cir.1997). Martin argues the record here displays similar inconsistencies in the justifications for denial of his claim. However, he has not pointed to any evidence in the record actually supporting a factual conclusion to that effect.

## C. Martin's Legal Claims

### 1. Improper Use of Non– Plan Standards

██ Martin claims that in denying his claim the plan administrator improperly imposed at least two limitations outside of the plan in reviewing his claim: (1) that "objective medical evidence" be provided to support his claim, and (2) that Martin show he was unable to fulfil the demands of a "sedentary" position. There is Ninth Circuit support for finding an abuse of discretion where limitations not present in the plan are used to deny coverage. In *Saffle v. Sierra Pacific Power Co.*, 85 F.3d 455 (9th Cir.1996), plaintiff was denied disability coverage because she was deemed to be able to perform work available for which she was qualified, with accommoda-

tions. However, the plan language at issue required that the participant be "completely unable to perform each and every duty" of her position. After noting the inherent ambiguity in the actual plan language, the Ninth Circuit found that the plan's substitution of the available work limitation "effectively imposes a new requirement for coverage." *Id.* at 459. The court thus found the plan's denial to be arbitrary and capricious on that basis. However, the court also found that the plan's interpretation of the "each and every duty" language to mean all of the substantial and material duties of her regular occupation a reasonable interpretation of the plan, even though it was not based on the text. *Id.* at 460.

In *Canseco v. Construction Laborers Pension Trust*, 93 F.3d 600 (9th Cir.1996), plaintiff was denied retroactive payments of retirement benefits based on the date of his application. While the plan made clear that payments could only be made on a beneficiary's application, it did not say, as the plan interpreted, that a delayed application acted as a waiver of entitlement to the retroactive payments. Following *Saffle*, the court found that interpreting the plan's application requirement as a prohibition on the payment of retroactive benefits was an abuse of discretion. "By retroactively denying benefits to a class of workers who have indisputably earned them, the Trustees have, in effect, imposed on those workers an additional requirement of eligibility: the submission of an application for benefits. We reject such an additional requirement as inconsistent with the terms of the CLPT plan, since nothing in the CLPT plan makes an application a prerequisite for eligibility." *Id.* at 609.

On this basis, Martin challenges the bringing of the terms "objective medical evidence" and "sedentary position" to bear on his claim. However, neither of these terms have been used in a way as to limit the plan's terms in the same manner as *Saffle* and *Canseco*. Instead, the terms

used were reasonable, and in fact necessary to give context to the plain language of the plan. In that way, both terms are more similar to the "substantial and material duties" requirement imposed in *Saffle*, 85 F.3d at 459, which was held to be reasonable even though it was not present in the plan language, than to the modifications identified as abusive of the plan's discretion there and in *Canseco*.

This distinction makes sense, because the plan itself cannot reasonably be expected to incorporate all of the terms salient to the determination of a claim, nor can it be expected to define the tasks and details of each plan beneficiary's job description. Ostensibly, the plan at issue here also covers those beneficiaries who may have greater than sedentary duties as well; therefore, the insertion of claim language customizing the standard of review to Martin's sedentary job level would make no sense, and would in fact disserve those with higher levels of activity in their job duties. As a matter of logic, it would be impossible to review plan language with respect to a claim without making some characterization of the demands of the claimant's job tasks. Here, Continental's occupational vocational specialist categorized Martin's position as sedentary to light, following federal guidelines. Glass Decl., ¶ 1–2. Martin has not challenged the correctness (or more saliently the reasonableness) of this categorization, and the theoretical challenge is alone not enough to support an abuse of discretion finding.

Framed otherwise, the plan's duties under ERISA are to discharge administrative responsibilities "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provision of ERISA." 29 U.S.C. § 1104(a)(1)(D). Neither this statutory language nor the holdings of *Canseco* and *Saffle* demand that plan administrators obtain all definitions from the plan, only that such definitions are in accordance with the plan. The real question, as *Canseco* and *Saffle* teach, is whether the use of terms is reasonable, or instead unreasonably creates arbitrary distinctions upon which claims with merit may be denied. *Saffle* shows that reasonable, albeit non-textual characterizations of a standard to meet do not amount to an abuse of discretion. As Martin's argument cuts too broadly, and the record here is factually dissimilar from the linguistic departures cited in *Saffle* and *Canseco*, his argument on this point fails.

### 2. Ailments Lacking Objective Etiologies

■ Martin's argument against the "objective medical evidence" standard has another facet, relying on a Third Circuit case finding in a case of chronic fatigue syndrome that a strict requirement of objective medical showing of disability constituted an abuse of discretion. *Mitchell v. Eastman Kodak*, 113 F.3d 433 (3d Cir. 1997). In *Mitchell*, plaintiff submitted two doctors' opinions that he had chronic fatigue syndrome that rendered him in the opinion of one doctor "100% disabled." Earlier doctors' opinions that did not diagnose CFS were indicative that those doctors lacked the expertise to diagnose CFS. Nonetheless, and despite the absence of any physician opinions questioning the CFS diagnoses, the plan denied Mitchell's claim for a lack of "objective medical evidence." The court found that this standard, which was not explicitly drawn from plan language, was unreasonable in the context of a CFS claim. "Although in some contexts it may not be arbitrary and capricious to require clinical evidence of the etiology of allegedly disabling symptoms in order to verify that there is no malingering, we conclude that it was arbitrary and capricious to require such evidence in the context of this Plan and CFS ..." All that the Plan required was that Mitchell show that he was in fact "disabled" as of June 26, 1989, and this he did ... Moreover, it was impermissible for the Administrator to imply an additional "clinical evidence of etiology" requirement not specified in the Plan document in the context of CFS. It is now widely recognized in the medical and legal communities

that "there is no 'dipstick' laboratory test for chronic fatigue syndrome." *Id.* at 442–443. Thus, because the plan administrator imposed an additional etiological requirement, and used it to deny Mitchell's claim of a recognized disease with "no known etiology," an abuse of discretion existed. *Id.*

Martin argues that post-polio syndrome, like CFS, is resistant to etiological proof, and that the reasoning in *Mitchell* should apply to his claim as well. However, on the other side of the ledger from *Mitchell* are two district court cases in this Circuit finding the imposition of an objective evidence requirement not to be an abuse of discretion, even where, as here, the disability complained of is symptomatic and subjective in nature.

In *Voight v. Metropolitan Life Ins. Co.,* 28 F.Supp.2d 569 (C.D.Cal.1998) (Morrow, J.), plaintiff suffered from acromegaly but was denied coverage because of the absence of "objective evidence" that the malady was disabling within the meaning of the plan. No "objective evidence" limitation was present in the language of the plan. The court found that imposition of that requirement was not an abuse of discretion. "It was not unreasonable for MetLife to require objective evidence as 'proof' of total disability. Given that Met-Life has discretionary authority to construe the terms of the Plan, Voight must prove that MetLife's interpretation of 'Total Disability,' or its 'proof' requirements, were arbitrary and capricious. Voight has failed to meet her burden in that regard." *Id.* at 578. Ultimately, the court found that the independent medical evaluator's determination that total disability had not been shown, despite conclusions of two treating physicians finding the opposite, was not an abuse of discretion. Thus, because "reasonable minds" could have accepted the conclusions underlying denial, the court would not substitute its judgment for that of the plan. *Id.* at 580.

A year later, *Jordan v. Northrop Grumman,* 63 F.Supp.2d 1145 (C.D.Cal.1999) (Collins, J.) reached a similar legal conclu-

sion, on facts more closely resembling those present here. There, plaintiff suffered from fibromyalgia but was denied benefits on the alleged basis of the plan's imposition of an "objective medical evidence" requirement. The court, while taking factual issue with this characterization of the record, analyzed the question addressed in *Mitchell* and *Voight.* "The harder question is whether MetLife abused its discretion by finding that Plaintiff had not provided sufficient 'objective evidence' that she was, in fact, totally disabled. There is some split of authority as to whether requiring objective evidence constitutes an abuse of discretion where, as here, the plan administrator has not indicated with particularity what objective evidence could be supplied ... But upon closer review of these cases, it is apparent that although plans use the term 'objective' evidence, courts make their evaluation on the basis of whether an applicant has presented sufficient evidence in general, subjective or not." *Id.* at 1160. *Jordan* then makes a cogent comparison of the fact scenario present in *Mitchell* (where the detailed and unanimous opinions of plaintiff's practitioners found disabling CFS were countered only by terse denials of coverage) with that in *Voight* (where conflicting evaluations as to plaintiff's disability existed in the record, and the plan explained its reasoning in favoring one diagnosis over another).

*Jordan* then moves to an examination of the record before it, and finds three broad reasons for affirming the denial of coverage, even though fibromyalgia, like Mitchell's CFS (and Martin's post-polio syndrome) lacks an objective etiology. First, *Jordan* found that the plaintiff's own admissions regarding the limitations placed on her activity by her illness showed she was capable of activities "much more arduous than her job requires." *Id.* at 1160. Second, the medical opinions were equivocal as to whether Jordan's condition actually affected her ability to perform a sedentary job. *Id.* at 1161. Third, the plan's denial came on conflicting and cryptic re-

ports from her treating physicians, and was offset by a detailed evaluation of her condition done by the plan's independent expert. *Id.*

All of the factors identified in *Jordan* find some resonance on this record. Martin has admitted that he is capable of a range of activities encompassing his sedentary job; the fact that those activities cause him subjective (or even medically objective) pain does not bring it to the level of a disability. Second, Martin's treating physicians differ on the actual course of treatment and the severity of his syndrome. In fact, there are conflicting opinions as to whether he even has the syndrome; Drs. Kasavin and Wakasa differ on that point, Dr. Roberts' third opinion relies exclusively on Dr. Wakasa's for his amended diagnosis, and Dr. Davis' opinion suggests at least sedentary activity is possible if not therapeutic. Third, the plan thrice explicated its denial in a consistent manner, twice providing a detailed analysis by its independent evaluator. Offsetting those detailed denials is the absence of empirical or etiological diagnoses of post-polio syndrome, and the compete absence of any reasoned opinion finding Martin disabled under the plan's definition. In fact, even the most severe diagnoses do not indicate why Martin's level of activity falls below that required for, and permitted by, a sedentary position.

*Jordan*'s most compelling teachings are its factually-based distinction between *Mitchell* and *Voight,* and its explanation of the differing outcomes in those cases as being based on the overall persuasiveness, thoroughness and unanimity of the record, not its "subjective" or "objective" nature. With that framework in mind, the record here reflects no single, clear conclusion as to Martin's diagnosis or more importantly his disability status. The selected portions of the record favoring him are contradicted by other medical opinion, and even the opinions most favorable to Martin taken alone do not mandate a finding of total disability. On that record, a detailed finding siding with some treating physicians' opinions over others is not an abuse of discretion, and does not warrant the Court's substitution of its judgment for that of the plan.

## CONCLUSION

On this record, the abuse of discretion standard applies. Martin has failed to demonstrate the application of the *Atwood* self-interest standard, as his claims of inconsistent bases fall to resonate in the record. Martin's major legal argument on the record also fails. A requirement of objective medical evidence is not an unreasonable requirement, nor is the characterization of Martin's job as sedentary erroneous, or even inconsistent with Martin's own representation in the record. Martin's point that post-polio syndrome is ultimately resistant to empirical testing does not save him on this record, as even if it were, the diagnoses made by Martin's own treating physicians do not provide that Martin is unable to meet the demands of a sedentary position. At best, they provide that the preferable course would be to cease office work entirely, but even that conclusion is not unanimous. Because the diagnoses collectively fail to provide the objective basis for a disability finding, and where they do find disability do so only conclusorily and without objective explication, the plan's denials of benefits are reasonable. Therefore, summary judgment is GRANTED.

**IT IS SO ORDERED.**