Rosemary JONES, Plaintiff,

v.

AETNA U.S. HEALTHCARE, and Republic New York Corporation Employee Welfare Benefit Plan, Defendants.

No. CV 00–08065 FMC (AIJx).

United States District Court, C.D. California.

March 27, 2001.

Order Amending Opinion April 16, 2001.

Glenn R Kantor, Gruber & Kantor, Encino. for Rosemary Jones, plaintiffs.

Ronald K Alberts, Vivian A Alberts, Berger Kahn Shafton Moss Figler, Simon & Gladstone, Los Angeles. for Aetna U.S. Healthcare esa Aetna Life Insurance Company, Republic New York Corporation Employee Welfare Benefit Plan, defendants.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

COOPER, District Judge.

### I. Introduction

Plaintiff Rosemary Jones filed this action under the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B) ("ERISA") against Defendants Aetna U.S. Healthcare ("Aetna") and Republic New York Corporation Employee Welfare Benefit Plan ("the Plan") for wrongful denial of long-term disability benefits. On January 12, 2001, the parties cross-moved for summary judgment as to Plaintiff's claim for disability benefits. Oral argument was heard on March 20, 2001. After considering the parties' oral and written arguments, the Court issues the following decision:

### II. Background

1. Plaintiff Rosemary Jones ("Jones") worked as an Assistant Treasurer in International Accounts for the Republic Bank of California ("Republic") from August 4, 1986 through May 4, 1998. (Defendants' Statement of Uncontroverted Facts ("Ds' Fact"), 1) Jones' annual salary was $45,542.00. (Plaintiff's Statement of Uncontroverted Facts ("P's Fact"), 2)

2. Jones' position as Assistant Treasurer required heavy computer work, customer account relations, lifting of boxes of documents, and overtime. (P's Fact, 2) Specifically, Plaintiff's job break-down was as follows: 75% computer work; 15% telephone use; 5% photocopier use; and 5% fax use. (Administrative Record ("AR"), 126) Plaintiff "occasionally" had to lift boxes weighing from 6 to 20 pounds. According to Jones' "Physical Demand Analysis" chart, "occasionally" is defined as 1% to 33% of Jones' workday, or 0.5 to 2.5 hours. (AR, 126)

3. As a benefit of her employment, Jones was insured under the Republic New York Corporation Employee Welfare Benefit Plan ("the Plan"). Aetna contracted with Republic to provide long-term disability ("LTD") coverage to its eligible employees. Aetna also administered Republic's self-funded short-term disability plan. (P's Fact, 3)

4. In order to qualify for LTD benefits, an employee must satisfy the eligibility requirements of the Group LTD Policy. As claims review fiduciary for the LTD Plan, Aetna reviews the plan requirements and all submitted claims for disability benefits. Based upon the individual circumstances of each claim, it determines whether a claimant qualifies for LTD benefits. (Ds' Fact, 4) According to the Plan, Republic retains Aetna's discretion to "de-

termine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy." (P's Fact, 4)

5. The policy allows Aetna to have its insured medically examined at its discretion. (P's Fact, 5)

6. The policy further provides that disability benefits will terminate on "[t]he date an independent medical report, when required, fails to confirm your disability." (P's Fact, 6)

7. Pursuant to the Plan terms, Jones was not eligible for LTD benefits until the expiration of six months after her disability absence was certified under the Plan. (Ds' Fact, 5)

8. Jones became eligible for LTD benefits from Aetna on November 4, 1998. (Ds' Fact, 5)

9. The policy defines disability in the first 24 months of disability as the inability to perform the material duties of "your own occupation" and thereafter, the duties of "any reasonable occupation." (P's Fact, 7)

10. In the early 1990's, following a car accident which, among other injuries, lacerated Jones' liver, Jones was diagnosed with chronic fatigue. (AR, 200)

11. According to one of Jones' treating doctors, Dr. Allen Salick, a rheumatologist, Jones began developing back pain in August of 1994, allegedly from poor ergodynamics at her work station. She was treated for back pain, and through the years, she developed sleep disorders, chronic fatigue, and general aches and pains. (Ds' Fact, 6)

12. In May 1998, Jones contracted viral pneumonia which resulted in a recurrence and exacerbation of her pain and fatigue symptoms. She further began to suffer severe sleep disturbance and headaches. Jones sought medical treatment from her physician, Dr. Daniel Wallace. Following a physical examination and a blood test, Dr. Wallace diagnosed Jones with Fibromyalgia Syndrome and bronchitis. As a result, Dr. Wallace certified Jones as disabled, effective May 21, 1998. (P's Fact, 9)

13. In early May, 1998, Jones stopped working because of these symptoms. (Ds' Fact, 6)

14. Jones submitted a claim for short-term disability benefits, which Aetna approved. (P's Fact, 10)

15. In June 1998, Jones consulted with Dr. Stuart Silverman, a rheumatologist. Dr. Silverman concurred with Dr. Wallace's report, concluding, "I think Ms. Jones clearly has fibromyalgia. I am willing to support her in joining the fibromyalgia self management program at Cedars Sinai Medical Center. I am willing to extend her disability during the period in which she is participating in rehabilitation." (P's Fact, 11)

16. The following month, Dr. Silverman completed Aetna's short-term disability certification form, certifying Jones' disability to September 30, 1998. (P's Fact, 12)

17. During this period, Jones completed a six-week pain self-management program at Cedars, with limited improvement. (P's Fact, 13)

18. In October of 1998, Jones was diagnosed with early Systemic Lupus Erythematosus (SLE). (Ds' Fact, 6)

19. Following the expiration of her short-term disability benefits, Aetna approved Jones for LTD benefits, effective November 4, 1998. (Ds' Fact, 7)

20. As part of its investigation into Jones' claim, Aetna arranged for an Independent Medical Exam ("IME") by Dr. Michael Lupo, Medical Director of St. Joseph's Medical Center, Rehabilitation Ser-

vices Department. He first examined Jones in October of 1998. (Ds' Fact, 8) Dr. Lupo conducted a physical examination and reviewed medical records submitted by other doctors who had examined Jones. Dr. Lupo determined that Jones could "return to work full-time as of today's examination with permanent physical restrictions that have been detailed on the attached physical capacities form. It is reasonable to expect some limitations involving endurance and regular rest breaks of approximately ten minutes per hour. . . . Fibromyalgia is a chronic condition that is best managed through an independent home or community base program in conjunction with intermittent physician follow-up for medication management and support. Her treatment to date has been appropriate and she has been given appropriate education for self-management through the Cedar–Sinai Fibromyalgia Program." (Ds' Fact, 9) Dr. Lupo also concluded that Jones could perform sedentary work full-time so long as she did not lift over ten pounds. (P's Fact, 14)

21. On August 19, 1998, Dr. Kamran Hakimian, who was on the American Board of Electrodiagnostic Medicine and Physical and Rehabilitative Medicine, and a fellow in rheumatology, provided a Functional Capacity Report concerning Jones' condition and ability to work. After examining Jones, Dr. Hakimian concluded that Jones "should be able to do light duty work providing adequate periods of rest, e.g., fifteen minutes rest for each hour work [sic]." He added that Jones' "symptoms are mild, progressing to moderate with activity. At the present time she is reporting improvement with physical therapy treatments. Therefore, it is recommended that she continue with supportive care while working with frequent rest periods." (Ds' Fact, 10) Dr. Hakimian also noted that Jones was unable to lift more than nine pounds. (P's Fact, 15)

22. The Plan provides that after a disability has been certified, Aetna may refer a plan participant to Vocational Rehabilitation ("VR"). Aetna referred Jones to VR, and a Rehabilitation Plan was drafted to assist Jones in her anticipated return to the work-force. (Ds' Fact, 11)

23. The Rehabilitation Plan, dated February 17, 1999, indicated that vocational specialist Debbie Curtis ("Curtis") was hired to assist Jones in finding "reasonable work." Reasonable work was described as "any position which meets the employee's restrictions, skills, and at least 60% of predisability income." (Ds' Fact, 12)

24. Despite Jones' refusal to sign the Rehabilitation Plan, Jones submitted logs of her potential job contacts to Aetna. (AR, 451; Ds' Fact, 13)

25. A February 11, 1999 Labor Market Survey indicated that there were reasonable jobs available that "would appear to be within the parameters of [Jones'] return to work plan." (AR, 463) The report went on to state, however, that "based on the competitive nature of the job market in Southern California, most employers could not accommodate a work restriction as noted above." (AR, 464) In addition, in a cover letter attached to the survey, Curtis wrote, "I did need to stress again, the reluctance of assuming that employers would tolerate frequent breaks or rest periods." (AR, 461)

26. In a meeting with Jones on January 20, 1999, Curtis observed: "the [employee's] joints in her fingers and feet were noticeably swollen. [Employee] changed positions frequently and when change was guarded and slow. Gailt [sic] was shuffling like. Doesn't think she could do PT work now." (P's Fact, 22; AR, 360)

27. During her discussions with Aetna, Jones made repeated requests for the information upon which Aetna had based its

conclusion that Jones could return to work with restrictions. (P's Fact, 21)

28. In February 1999, in order to review her obligation to participate in rehabilitation, Jones wrote to Aetna to request "a copy of your insurance policy along with all medical reports. I understand that under ERISA I am entitled to obtain a copy of the plan and policy and to any medical evidence used against me." (P's Fact, 23; AR, 61)

29. In response, Aetna advised Jones that it would not release the requested information because Jones was still receiving benefits. If her claim was denied, Jones could submit a new request at which time Aetna would provide her with the information upon which the denial was based, but not her entire medical record. Jones inquired as to whether ERISA required Aetna to release the requested information. Aetna responded that ERISA applies only upon denial of the claim. (AR, 274)

30. The following month, Jones again contacted Aetna to express her concern that the opinions of her own doctors were not being considered and that Aetna had not even contacted her doctors in months. (AR, 305) She asked again for a copy of the plan document. (AR, 305)

31. In May of 1999, Curtis noted that Jones has been making at least 16–20 in person resume contacts a week with "not many responses." (AR, 270)

32. On June 3 1999, Jones consulted with Dr. Dennis Ainbinder, a board-certified orthopaedic surgeon. Dr. Ainbinder noted Jones' reported frequent pain in her cervical spine and lower back. Such pain is aggravated by bending, lifting, twisting, pushing, pulling, and sitting approximately one hour. Dr. Ainbinder also noted Jones' frequent pain in both hands, aggravated by gripping, grasping, pushing, pulling and fine manipulation.

Dr. Ainbinder's report further noted that there is tenderness to the paravertebral and trapezial muscles, and pain upon terminal motion. A physical examination of Jones' cervical spine revealed that the head and neck were well-centered, without evidence of torticollis or other deformity. Examination of Jones' lumbosacral spine revealed "a normal gait. The patient was able to stand on heels and toes without difficulty. The pelvis was level. There was no loss of the normal lumbar lordosis." Dr. Ainbinder noted tenderness to the midline, and pain upon terminal motion. In addition, examination of Jones' wrists revealed no redness, warmth, swelling, or change of skin color.

Dr. Ainbinder diagnosed Jones as suffering from Overuse Syndrome in both wrists and Cervical and Myofascial Sprains. Dr. Ainbinder concluded that Jones "will remain temporarily totally disabled" and should "return to my office in four weeks." Dr. Ainbinder referred Jones to Dr. Salick for evaluation of her Fibromyalgia. (P's Fact, 27; AR, 66–72; AR, 75)

33. On June 4, 1999, Dr. Salick examined Jones, confirming the diagnoses of Jones' other physicians. "...Jones...developed an Upper Extremity Overuse Syndrome and Chronic Back Pain stemming from the cumulative trauma of her work according to her history and a review of medical records." These chronic pains then caused her to develop a sleep disorder, which gradually progressed into a chronic fatigue syndrome and eventually she had the classic picture of Fibromyalgia. This Fibromyalgia has been diagnosed and confirmed by two noted rheumatologists, namely, Drs. Wallace and Silverman. Also, two years ago a diagnosis of SLE was made. She has not returned to work because of all of these symptoms and is on a variety of medi-

cations to treat them including Plaquenil, Neurontin, Klonopin, Prisolec, Floricet, Naprosyn and Trazadone.

I concur with these diagnoses. Even though her laboratory tests are now normal with a negative ANA, she has a classic malar rash of SLE and she has all the 1990 American College of Rheumatology criteria for the diagnosis of Fibromyalgia.

Her Fibromyalgia is a complication of a chronic pain disorder stemming from the cumulative trauma of her work. SLE can be both precipitated and aggravated by emotional and physical stress. Her SLE may very well also be work related, depending on my review of medical records.

WORK RESTRICTION: She is still temporarily and totally disabled as a result of her Fibromyalgia and SLE. (P's Fact, 28; AR, 73–78)

34. On July 1, 1999, Dr. Lupo once again examined Jones and provided an IME follow-up report. In addition to the physical exam, Dr. Lupo reviewed records from Jones' treating physician Dr. Silverman, as well as several laboratory reports. Dr. Lupo's impression of Jones' condition was that she suffered from fibromyalgia, depression, and mild SLE. Dr. Lupo again concluded that Jones could return to work on a full-time basis with permanent physical restrictions to a sedentary or light level. He attached a physical capabilities form where he indicated that Jones should not engage in any climbing, crawling, or stooping. He restricted her lifting to nothing over ten pounds and noted that she would need regular rest breaks of approximately ten minutes per hour. (Ds' Fact, 15; AR 80–85)

35. Aetna terminated Jones' benefits as of July 2, 1999. Aetna initially notified Jones of the termination by phone. During the conversation, Jones requested a copy of the IME. Aetna responded, "I asked her to fax me a request for the info and then depending on the contract we will respond." (AR, 263)

36. By letter of August 4, 1999, Aetna confirmed the denial of Jones' benefits. The denial letter reads, in pertinent part: "Based on the following analysis, we are denying your claim for benefits, effective July 2, 1999 . . . ."

A review of your file shows you were employed as an Assistant Treasurer at the time you ceased active work. You were required to do light sedentary work with occasional lifting of boxes weighing approximately 25 lbs.

The results of an Independent Medical Examination conducted by Dr. Lupo, on July 1, 1999 reveal that you can return to your former occupation of a sedentary light occupation with a break available each hour, physical capacities consistent with your own occupation.

In view of the above, Aetna is denying your claim for disability benefits on the basis that an Independent Medical Exam fails to confirm your disability. . . . Aetna also informed Jones that it will "review any additional information you care to submit, such as medical information from all physicians who have treated you for the condition(s) in question. . . ." Aetna advised Jones she could also submit a detailed narrative report indicating why her disability benefits should not be terminated. Additionally, Aetna told Jones that she is "entitled to a review of this determination" as well as "a review of all documents pertinent to your claim." (AR, 85–86)

37. On September 2, 1999, Jones appealed the denial of her claim. She enclosed a letter from Dr. Silverman, as well as the reports from Drs. Ainbinder and Salick. In her letter, Jones expressed her dissatisfaction with Aetna's handling of her case, including Aetna's denial of her re-

peated requests for information. Jones noted that "[a]ccording to the contract between Republic National Bank and Aetna," I have the "absolute right to know any information Aetna has in its files related to my case...."

Jones also made reference to Aetna's "Approved Rehabilitation Program," mandated by Aetna on February 17, 1999. Jones claimed that "[f]or the last 5½ months, I have worked very hard making over 360 contacts and having to go outside of my home to use a computer and fax machine. Your company never took into consideration my health and the stress this added to my condition...."

Jones noted that Aetna's own vocational counselors had instructed her not to mention to possible employers that she required breaks every hour in order to sustain employment, a "stipulation placed by [Aetna's] IME. Additionally, I was directed not to disclose that I have been out on disability for the past year for it would reflect negatively and lack of cooperation on my part."

Jones cites to the portion of Aetna's August 4, 1999 letter which stated that Jones could "return to [her] former occupation of a sedentary light occupation with a break available each hour." Jones noted, however, that in her former occupation, "her first break, if lucky, was a lunch break. No break every hour was ever available or heard of. In fact, when your first decision was made back in December 22, 1998, informing me to return to work with the aforementioned stipulation (10 minute per hour rest), my former employer could not accommodate this condition. This ultimately led to my termination with Republic National Bank." (P's Fact, 33; AR, 88–90; AR, 309)

38. On September 3, 1999, Dr. Silverman wrote Aetna to dispute the termination of Jones' disability benefits. He asserted that Jones was "unable to return to her former sedentary light occupation as an assistant treasurer. She is not able to do light and sedentary work." He noted that Jones "describes widespread pain all the time which is frequently severe." Functionally, she is unable to do some activities of daily living "such as taking a tub bath, walk long distances, get a good night's sleep and deal with feelings of anxiety & depression related to her functional losses. She has much difficulty getting in & out of bed, standing up from a chair, opening a new milk carton, reaching & getting a 5-lb object from above her head and doing heavy chores such as vacuuming & yard work." He added that Jones has a "poor sitting tolerance of about four hours. She can sit less than one hour, stand five to ten minutes and walk one and a half to two blocks without stopping." Dr. Silverman concluded that Jones was "clearly disabled and is unable to work a forty hour work week on a regular basis due to her Fibromyalgia. She has unpredictable pain & fatigue which would interfere with her attendance as well as her productivity. Based on this, I disagree strongly that she is able to return to her former occupation." (P's Fact, 34; AR, 133–134)

39. Aetna submitted Jones' updated medical records, as well as a tape of yet additional surveillance taken of Jones in April 1999 (the third round of surveillance) to Dr. Lupo for further opinion. (P's Fact, 35; AR, 258–259)

40. On December 6, 1999, Dr. Lupo provided an addendum report, indicating he had reviewed the surveillance tapes. The videotapes recorded Jones' activities over a period of three days. Jones was observed making a number of stops "including a Denny's Restaurant, Costco Store, and what is apparently a 7–11 store in the company of several other individuals. She is observed carrying a large handbag either in one hand or over her

shoulder. She is observed to get in and out of a car easily and close the car door with her left hand. She is able to bend over to set her handbag on the ground or to pick a rose at her residence. On the portion of the tape dated 4–20–99, she leaves the house at 10:13 a.m. and after making multiple stops, returns to her house at 12:26 p.m. During all of the activities observed, there does not seem to be any change in her overall appearance. Her gait remained normal and her activity level about the same."

Dr. Lupo also reviewed Dr. Ainbinder's June 3, 1999 report, Dr. Salick's June 4, 1999 report, and Dr. Silverman's September 3, 1999 appeals letter. Dr. Lupo concluded that "[b]ased on my review of the medical information provided and prior examination of [Jones], her self reported deficits are not consistent with the activities portrayed on the videotape. I previously gave my opinion that she is capable of returning to work at a sedentary or light level. The activities observed on the videotape support the recommendation. I had also recommended that she be given regular rest breaks of approximately 10 minutes per hour because of limitations involving endurance. On the videotape she is observed intermittently on 4/20/99 over a period of more than 2 hours and at the conclusion I saw no objective change in her activity level or outward appearance physically. Obviously the tape represents only a sampling of her everyday activity, however it is not consistent with all of the limitations she has described to various physicians. I still feel that the patient's condition is consistent with fibromyalgia and that there has been objective evidence of systemic lupus erythematosis that was minimally active at least at the times that I saw her personally. She may still require rest breaks at times while working; however, based on the videotape may not require rest breaks as frequently as 10 minutes per hour which was previously

recommended." (Ds' Fact, 30; AR, 129–130)

41. On December 14, 1999 Aetna requested and received from Republic Bank a physical demands analysis regarding Jones' former position. The report confirms that on occasion, Jones was required to lift up to 20 pounds. (P's Fact, 37; AR, 106)

42. Aetna issued its final denial letter of Jones' claim on January 19, 2000. In the letter, Aetna described Jones' former position as being one of light duty, requiring Jones to do computer work, talk on the phone, and use the photo copier and fax machine. (Ds' Fact, 31; AR, 119–120) The letter stated that Aetna's Medical Director, Dr. Robert Bonner, had reviewed Jones' letter of appeal; Dr. Lupo's July 1, 1999 IME; Dr. Lupo's December 6, 1999 addendum to the IME; case notes; and the reports of Drs. Ainbinder, Salick, and Silverman.

The denial letter notes that Dr. Lupo's July 1, 1999 IME shows an "unremarkable exam, except for FMS tender points....There was mild soft tissue tenderness involving multiple areas on the neck, back, upper and lower extremities, typical of fibromyalgia. You ambulated slowly, but with otherwise normal gait. Dr. Lupo further states that you can return to work on a full-time basis to a sedentary or light level position. It is reasonable to expect some limitations involving endurance and regular rest breaks of approximately 10 minutes per hour. Documentation shows you to have had mild systemic lupus erythematosis which did not currently appear to be active and you received appropriate training to manage your fibromyalgia though the Cedar–Sinai program."

The denial letter further explains to Jones that "[t]he Functional Capacity Evaluation worksheet shows you to be capable of occasional lifting of 1–5 lbs., and

6–10 lbs. Occasional kneeling, pushing, pulling, forward reaching, carrying, bending, twisting, and reaching above shoulder. Total number of hours you are capable of working per day was found to be eight hours." The letter also references the surveillance performed on Jones from April 19–21, 1999, which shows Jones "to be active over a three day period."

Aetna emphasized that it was influenced by Dr. Salick's report indicating a normal examination of Jones' upper extremities and a negative electrodiagnostic evaluation in June of 1999. Aetna notes this is in contrast to Dr. Ainbinder's statements from the day before, which appear to find Jones disabled based on subjective symptoms. The letter goes on to say that "Dr. Ainbinder confirms a diagnosis of Fibromyalgia at his exam on June 3, 1999. Dr. Silverman appears to find you disabled based on the Fibromyalgia findings and your subjective report of your abilities."

Aetna concludes that "[b]ased upon the above information, Aetna finds you functionally capable of performing the duties of your prior occupation." (Ds' Fact, 31; AR, 119–120)

### III. Summary Judgment Standard

Summary judgment or summary adjudication is only proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Summary judgment is appropriate where the nonmoving party fails to make a sufficient showing on an essential element of the case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### IV. Discussion

#### A. Standard of Review for ERISA Benefit Determinations

ERISA § 502(a)(1)(B) provides plan participants and beneficiaries with an express private right of action to recover benefits due to them under the terms of their plan. 29 U.S.C. § 1132(a)(1)(B). ERISA, however, does not expressly set forth any standard of review for courts to apply in adjudicating a benefits dispute.

■ In 1989, the United States Supreme Court specifically addressed the appropriate standard of review to be applied to § 502(a)(1)(B) actions. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The standard with which the Court must review the benefits eligibility decision turns on whether the Plan grants an administrator or fiduciary discretion to determine eligibility for benefits. *Id.* at 115, 109 S.Ct. 948. When an ERISA plan administrator is given discretion to determine benefits eligibility, as the parties agree the Plan does in this case,[1] the Court must

---

1. The Plan unambiguously provides: "For the purpose of section 503 of Title 1 of [ERISA], Aetna is a fiduciary with complete authority to review all denied claims for benefits under

this policy ." The Plan goes on to state, "In exercising such fiduciary responsibility, Aetna shall have discretionary authority to: deter-

review the decision denying benefits under the deferential abuse of discretion standard, rather than performing a *de novo* review of the record. *See Friedrich v. Intel Corp.*, 181 F.3d 1105, 1109 (9th Cir. 1999); *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794, 797 (9th Cir.1997).

 The degree of judicial deference associated with this standard of review may, however, be affected by factors such as conflict of interest. *See Firestone*, 489 U.S. at 115, 109 S.Ct. 948 (courts must weigh conflict as a "factor" in determining whether abuse of discretion has occurred); *see also Lang*, 125 F.3d at 797. Given Aetna's dual role as both the funding source and the administrator of the Plan, the Court is faced with an inherent conflict of interest situation. *See Firestone*, 489 U.S. at 115, 109 S.Ct. 948; see *also Brown v. Blue Cross and Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1561 (11th Cir.1990) ("Because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business."). If that inherent conflict leads to actual conflict, the standard of review does not exactly change, but the Court reviews Aetna's denial of benefits under a heightened level of scrutiny. *See Snow v. Standard Ins. Co.*, 87 F.3d 327, 331 (9th Cir.1996), *overruled on other grounds by Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir.1999) (en banc); *Parker v. BankAmerica Corp.*, 50 F.3d 757, 763 (9th Cir.1995); *see also Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 63 F.Supp.2d 1145, 1155 (C.D.Cal.1999) (if an actual conflict of interest is shown, the Court still reviews on

an abuse of discretion basis, but it becomes "less deferential").

 The burden to show an actual conflict of interest lies first with the affected beneficiary, who must provide "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary." *Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1323 (9th Cir.1995). If not, a traditional abuse of discretion review is applied. On the other hand, if the beneficiary has made the required showing, the principles of trust law require the Court to act skeptically in deferring to the discretion of an administrator who appears to have committed a breach of fiduciary duty. *See id.; see also Firestone*, 489 U.S. at 111, 109 S.Ct. 948 ("In determining the appropriate standard of review for actions under § 1132(a)(1)(B), we are guided by principles of trust law.").

### B. *Record to be Reviewed*

 A court's decision as to whether a plan administrator abused its discretion must be based on the facts known to the administrator at the time the benefits claim decision was made; i.e., the Administrative Record. *See Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1471 (9th Cir.1993); *Mizzell v. Paul Revere Life Ins. Co.*, 118 F.Supp.2d 1016, 1020 (C.D.Cal. 2000). The Ninth Circuit in *Taft* explained that "[p]ermitting a district court to examine evidence outside the administrative record would open the door to the anomalous conclusion that a plan administrator abused its discretion by failing to consider evidence not before it." Moreover, such

---

mine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy. Aetna shall be deemed to have

properly exercised such authority unless Aetna abuses its discretion by acting arbitrarily and capriciously." (AR, 52)

expanded review would impede an important purpose of the federal statute under which the district courts have jurisdiction to review these administrative decisions:

"A primary goal of ERISA was to provide a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously. Permitting or requiring district courts to consider evidence from both parties that was not presented to the plan administrator would seriously impair the achievement of that goal."

*Taft,* 9 F.3d at 1472 (citing *Sandoval v. Aetna Life & Casualty Ins. Co.,* 967 F.2d 377, 380 (10th Cir.1992)).

Both parties seek to introduce evidence that was not part of the Administrative Record at the time the denial of benefits decision was made. Jones has introduced a July 7, 2000 Social Security Disability determination, and Aetna has submitted the Declaration of Dr. Robert Bonner. The Court will not consider either of these documents.

## C. *Abuse of Discretion and Conflict of Interest*

■ The Supreme Court has held that under the abuse of discretion standard, the "interpretation will not be disturbed if reasonable." *Firestone,* 489 U.S. at 111, 109 S.Ct. 948; *see also Zavora v. Paul Revere Life Ins. Co.,* 145 F.3d 1118, 1123 (9th Cir.1998) ("Although we recognize that an ERISA administrator is entitled to substantial deference, it still must have some reasonable basis for its decision denying benefits."). It is an abuse of discretion for an ERISA plan administrator to make a decision without any explanation, or in a way that conflicts with the plain language of the plan, or that is based on clearly erroneous findings of fact. *See Taft,* 9 F.3d at 1472–1473. The objective of such a standard is to determine whether the administrator's interpretation of a plan is a reasonable one, not whether it is the correct one or the interpretation the Court would have made on its own. *See Doe v. Travelers Ins. Co.,* 167 F.3d 53, 57 (1st Cir.1999); *Haley v. Paul Revere Life Ins. Co.,* 77 F.3d 84, 89 (4th Cir.1996). The administrator's decision must be supported by "substantial evidence," i.e., evidence that reasonable minds might accept as adequate to support the determination made. *Snow,* 87 F.3d at 332; *Miller v. United Welfare Fund,* 72 F.3d 1066, 1072 (2d Cir. 1995).

■ As discussed above, Aetna's dual role as both funding source and administrator of the Plan compels the Court to examine Aetna's decision with heightened scrutiny. Jones bears the initial burden of providing material, probative evidence beyond the apparent conflict that tends to show Aetna's self-interest caused a breach of its fiduciary duties.

■ Jones presents undisputed evidence that Aetna's own retained medical examiner, Dr. Lupo, acknowledged that Jones suffers from fibromyalgia, depression, and mild SLE. Nevertheless, Dr. Lupo concluded that Jones could return to work with permanent physical restrictions, i.e., she required ten minutes of rest per hour and was not to lift over ten pounds. Based on these findings, Aetna concluded Jones was not disabled under the Plan because she was still able to perform the "material duties" of her own occupation.

Jones' job description, however, required Jones to occasionally lift boxes weighing up to 20 pounds. Aetna, in its August 4, 1999 denial letter, admitted to Jones being required to lift up to *25 pounds.* (emphasis added) "Occasionally" is defined as up to 33% of the work day. There was no evidence before the administrator as to what percentage of Jones' day was actually spent doing that heavy lifting. There was also no evidence indicating

whether Jones' job, which included computer, photocopier, and fax use, could be performed without carrying those heavy boxes. There was therefore no evidence before the administrator indicating that Jones could indeed perform the material duties of her job given her inability to lift over ten pounds and her limitation of taking ten minute rest breaks per hour.

Jones, on the other hand, presents evidence demonstrating that she was unable to perform the material duties of her occupation. A 1999 Labor Market Report indicated that based on the competitive job market in Southern California, most employers could not accommodate Jones' work restrictions. Even the vocational specialist Aetna referred Jones to admitted that employers would be unlikely to tolerate Jones' restrictions. Jones informed Aetna in her appeal letter that Aetna's own vocational counselors instructed her not to mention to potential employers that she required breaks every hour in order to sustain employment, a stipulation placed by Aetna's own "independent" medical examiner. Furthermore, evidence was presented that Jones was sending out 16–20 resumes a week without obtaining employment. Dr. Lupo concluded, after his second examination of Jones, that her return to work full-time still contained the same restrictions as to lifting and rest breaks. Most significantly, Jones informed Aetna in her appeal letter that these restrictions resulted in Jones being fired from her former job, a position she held for over twelve years. Aetna does not dispute this evidence. A determination that Jones could perform the material duties of her own occupation is not reasonable where her employer found she could not do so.

██ Moreover, the Court seriously questions the objectivity of the Plan's provision allowing for termination of disability benefits based solely on the opinion of an "independent" medical examiner of Aetna's choosing. Such a provision, in practice, allows for termination of benefits even if the employee's own treating physicians concur that the employee is disabled. Jones' disability benefits were terminated despite all four of her treating physicians concluding she was disabled. Dr. Silverman specifically informed Aetna that Jones was unable to return to her "former occupation." Dr. Salick commented that Jones' condition is a complication stemming from the cumulative trauma of her work. Dr. Bonner, Aetna's Medical Director who conducted the final review of Jones' case, determined that Jones could return to work with the physical restrictions in place; however, Dr. Bonner never examined Jones. A treating physician's opinion is generally entitled to greater weight than that of the non-treating physician. *See Murray v. Heckler,* 722 F.2d 499, 501–502 (9th Cir.1983); *see also Donaho v. FMC Corp. .,* 74 F.3d 894, 901 (8th Cir.1996) (reviewing physician's opinion entitled to less weight than treating physician in ERISA disability cases). A policy provision which gives complete veto power to a non-treating physician is of questionable validity and is bound to be weighed against the insurer in a judicial analysis of the reasonableness of the insurer's decisions.

Jones also asserts that Aetna ignored her repeated requests for documents pertinent to her case. ERISA § 503(2) and the accompanying regulations, 29 C.F.R. § 2560.503–1(g)–(h), require plans to provide an integral process for the appeal of any benefits claim denial. Every plan must establish and maintain a procedure by which a claimant or his duly authorized representative has a reasonable opportunity to appeal a denied claim to an appropriate named fiduciary, and under which a full and fair review of the claim and its denial may be obtained. *See* 29 C.F.R.

§ 2560.503–1(h)(1). The review procedure must allow a claimant or his representative to request a review upon written application to the plan; review pertinent documents; and submit issues and comments in writing. *Id.* at § 2560.503–1(h)(2)(i)–(iv). Furthermore, Section 1024(b)(4) of Title 9 of the United States Code requires Aetna to furnish plan documents upon written request.

■ While failure to comply with ERISA's procedural requirements normally does not result in an award of benefits, *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1353 (9th Cir.1984) ("Ordinarily, a claimant who suffers because of a fiduciary's failure to comply with ERISA's procedural requirements is entitled to no substantive remedy."), procedural violations may be considered as a factor in determining whether the decision to deny benefits constitutes an abuse of discretion. *Id.* ("Under ERISA, however, no great wall divides procedural from substantive violations. Although reporting and disclosure requirements are arguably procedural, it is these procedural requirements that alter the very balance of knowledge and rights between covered employees and their employer."); *see also Palmer v. Univ. Med. Group*, 994 F.Supp. 1221, 1240 (D.Or.1998) ("If most ERISA benefits decisions are to be reviewed only for abuse of discretion...then these requirements assume added importance. The Plan's internal review process may be the claimant's last genuine opportunity to influence the final decision, to supplement the record in preparation for judicial review, or to correct any errors in the existing record. Meaningful participation in this internal review process therefore requires that the claimant have an opportunity to review the relevant documents in the claim file so the claimant may submit any additional documents, correct any errors in the record, point to any favorable evidence that would tend to support the claim, fully understand the reasons for the decision that is being appealed, and to otherwise prepare an informed response to that decision.").

Aetna does not dispute that Jones requested various documents during the course of the investigation. Jones requested a copy of the Plan as well as a copy of Dr. Lupo's report, but never received either of these documents from Aetna. Although Jones did not have access to Dr. Lupo's report, she was aware of his pertinent findings prior to her appeal. Aetna's technical violations of ERISA's disclosure requirements do not, in and of themselves, entitle Jones to an award of benefits. Aetna's failure, however, to abide by ERISA's disclosure requirements have been considered by the Court as an additional factor demonstrating Aetna's decision was tainted by conflict.

Jones has presented material, probative evidence showing Aetna's conflict of interest caused a breach of Aetna's fiduciary duties. In examining Aetna's decision with heightened scrutiny, the Court concludes that Aetna did not act reasonably.

## V. Conclusion

Aetna's motion for summary judgment is DENIED. Jones' motion for summary judgment is GRANTED, and Aetna's decision denying Jones' claim for disability benefits is hereby REVERSED. Aetna is instructed to pay Jone's disability benefits for the entire two year period covered by the "own-occupation" provision of the policy. The court expresses no opinion concerning Aetna's obligation, if any, for benefits under the "any occupation" provision of the policy.

IT IS SO ORDERED.